CIA. PETROLERA CARIBE, INC.,
Plaintiff, Appellant,

v.

ARCO CARIBBEAN, INC., et al.,
Defendants, Appellees.

No. 84–1194.

United States Court of Appeals,
First Circuit.

Argued Sept. 6, 1984.

Decided Feb. 6, 1985.

Celso E. Lopez, San Sebastian, P.R., with whom Carlos F. Lopez, San Juan, P.R., was on brief, for plaintiff, appellant.

Max K. Jamison, Santa Monica, Cal., with whom Alvaro R. Calderon, Jr., and Calderon, Rosa-Silva & Vargas, Hato Rey, P.R., were on brief, for defendants, appellees.

Before COFFIN and BOWNES, Circuit Judges, and SELYA,* District Judge.

BOWNES, Circuit Judge.

In this antitrust action, plaintiff-appellant Cia. Petrolera Caribe, Inc. (Caribe) appeals entry of summary judgment in favor of defendants Arco Carribean, Inc. (Arco), U.S.A. Petroleum Corp. (USAP), Isla Petroleum Corporation (Isla), and Gasolinas de Puerto Rico (GPR). The complaint alleges that USAP's acquisition of Arco's Puerto Rican assets violated §§ 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18, 19, and §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Although the complaint originally requested both damages and injunctive relief, Caribe abandoned the request for damages in the district court and asked only for an injunctive remedy, particularly divestiture, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

Caribe challenges three rulings of law by the district court. It first claims that the district court erred in ruling that it lacked standing to bring the action because it had not been and would not be injured as a proximate result of the alleged antitrust violations. Second, Caribe contends that the court erred in holding that the specific injunctive remedy it sought—divestiture—is not available to a private litigant such as Caribe. Finally, plaintiff contends that disputed relevant and material facts rendered summary judgment inappropriate.

Caribe also forwards as error two procedural rulings: the district court's acceptance and reliance upon affidavits and a reply brief submitted by the defendants on their motion for summary judgment despite the court's refusal to accept plaintiff's affidavit or to allow it an opportunity to reply; and, the district court's refusal to allow oral argument on summary judgment.

We first discuss whether plaintiff has "standing" for maintaining this suit. Because we conclude that it does, we then review plaintiff's procedural claims. We next examine the propriety of awarding summary judgment on liability in favor of defendants, and conclude with a discussion of why we believe plaintiff's remedies include divestiture.

## I. BACKGROUND

We recount the facts in the light most favorable to the plaintiff, against whom summary judgment was entered. Caribe is in the wholesale and retail gasoline business. It wholesales refined gasoline to a small chain of service stations in Puerto Rico it owns and operates. Defendant USAP is an oil company headquartered in the continental United States that bought the Puerto Rican assets of Arco Carribean, Inc., a subsidiary of the multinational oil company Atlantic Richfield, Inc. This acquisition constitutes the merger contested here. Prior to this acquisition, USAP's only participation in the Puerto Rican gasoline market was through its wholly owned subsidiary, GPR. GPR owns and operates a number of service stations in Puerto Rico. As part of the merger plan formulated by USAP, another wholly owned subsidiary, Isla, was created. Isla's purpose was to take title to the Puerto Rican assets of Arco Carribean and to continue the management and operation of the former Arco stations. After consummation of the merger in July 1981, Isla became the wholesaler of gasoline not only to the former Arco (now Isla) service stations but also to those operated by GPR. Neither GPR nor Isla markets gasoline outside Puerto Rico.

Caribe entered the gasoline market in Puerto Rico in 1979 and slowly but steadily expanded its operations. By mid-1981, it was operating twenty-four stations and was planning an additional eight. It appears that most of these stations served rural and less populous regions of Puerto Rico. At its highest point, Caribe's market share was 1.1%. Caribe claims that because of the merger, a trend toward greater concentration in the market has occurred, lessening competition and threatening the survival of the smaller companies

---

* Of the District of Rhode Island, sitting by designation.

including itself. It alleges that it will be "squeezed" out of the market by the oligopolist firms. It further claims that the increase in market share of the top five has increased their market power, and consequently their ability to dictate the conditions for doing business to the smaller companies. Caribe believes the inevitable result will be harm to consumers in the form of price hikes. Caribe asserts that the harm to itself resulting from this concentration of market power is affirmatively shown by its inability to expand beyond the hinterlands of Puerto Rico into the more populous metropolitan areas. It also claims that increased market concentration, in conjunction with other barriers to entry, effectively prevents the entrance of other competitors into the market.

Immediately preceding the merger, the Puerto Rican gasoline market also included seven multinational, vertically integrated companies: Texaco, Esso, Shell, Gulf, Mobil, Chevron and Arco.[1] The first four of these firms plus GPR controlled 77% of the market at the time of the merger but, after the merger, their proportion rose to a high of 83%. GPR's own market share rose from 5.29% to 9.33% after its merger with the former Arco subsidiary. Caribe's market share at that time was 0.4%.

## II. STANDING UNDER § 16

Caribe's claims for injunctive relief are based on § 16 of the Clayton Act, 15 U.S.C. § 26, which reads in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings....

---

[1] At oral argument, we were informed that the Puerto Rican assets of Gulf and Chevron have recently been merged.

The district court held, without more, that Caribe lacked standing "on all causes of action because it has not been, and will not be, damaged as a result of any conduct alleged in its complaint."

Although the complaint would never serve as a model for antitrust pleadings, it does specifically invoke § 16 of the Clayton Act in paragraph one. In Count I, paragraph 12b, it is alleged that the merger will "materially impair the competitive effectiveness of Plaintiff and others that were and are now competing with ARCO and the buyer." In Count II, paragraph 15, it is alleged that the objective of the merger was to "restrain[ ] and prevent[ ] plaintiff and others from exercising an essential and necessary part of their lawful trade or business in interstate trade or commerce." Paragraph 17 in Count II also alleges "plaintiff has lost customers, patronage and trade and has been prevented and detered [*sic*] from continuing and expanding and increasing its business as otherwise [*sic*] would have done." These bare bones allegations have been supplemented with additional facts through affidavits and depositions of record.

◼ It appears that the district court erroneously applied the requirements of § 4 of the Clayton Act, 15 U.S.C. § 15, which authorizes treble damages for antitrust violations, to plaintiff's request for § 16 injunctive relief. In *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972), the Supreme Court noted an important difference between the requirements of § 16 and those of § 4. The Court pointed out that a § 4 claim requires an *injury* to "business or property" that § 16 omits. The Court noted that, by contrast, § 16 provides that "any individual *threatened with injury* by an antitrust violation may ... sue for injunctive relief against violations of the antitrust laws...." *Hawaii v. Standard Oil Co.*, 405 U.S. at 261, 92 S.Ct. at 890–91 (emphasis added). Plainly, Congress em-

powered a broader range of plaintiffs to bring § 16 actions because the standards to be met are less exacting than those under § 4; under § 16, a plaintiff need show only a threat of injury rather than an accrued injury.

■ The Court's remarks in *Hawaii* reaffirm its conclusions in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), a case more nearly on point. The Court took to task the court of appeals for vacating a portion of an injunction because it believed that

> Zenith's failure to prove the fact of injury barred injunctive relief as well as treble damages. This was unsound, for § 16 of the Clayton Act, 15 U.S.C. § 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and *authorizes injunctive relief upon the demonstration of "threatened" injury ...; he need only demonstrate a significant threat of injury* from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.

*Id.* at 130, 89 S.Ct. at 1580 (citations omitted; emphasis added). Although this was an enunciation of the standard a plaintiff must satisfy for an injunction to issue after trial, it applies here because to withstand a motion for summary judgment, a plaintiff is not required to plead additional matters and submit supporting proof more exacting than that ultimately required for judgment in its favor.

■ As we have recently observed, "[t]he principles of standing determine whether a particular plaintiff is the type of person the law intends to protect against the harm of which he complains." *Ozonoff v. Berzak*, 744 F.2d 224, at 227 (1st Cir. 1984). We cannot conceive of a more appropriate plaintiff to challenge defendants'

merger.[2] Caribe is a direct competitor of defendants in the refined gasoline market. The gravamen of its complaint is that defendants' merger tends to lessen competition and to yield a greater concentration of firms within that market. Caribe acknowledges that it has not sustained an actual measurable injury in the short term flowing from the merger, but it correctly claims that this is not required for a § 16 action; its allegations that the refined gasoline market has been harmed by these putative antitrust violations and that it will likely be "squeezed" out of the market in the foreseeable future because of defendants' actions are sufficient. Accordingly, we rule that Caribe has alleged sufficient facts showing it " 'personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,' *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976)." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote omitted). None of the prudential considerations we summarized in *Ozonoff* counsel otherwise. *See Ozonoff v. Berzak*, 744 F.2d 224, at 227–228. Caribe is a proper plaintiff to bring this action.

## III. PROCEDURAL CLAIMS

### A. *The Reply Brief and Affidavits*

Faced with a motion for partial summary judgment filed by plaintiff Caribe and a cross-motion for summary judgment filed by defendants, the district court established a timetable at a pretrial conference on November 7, 1983, and restated it in an

---

**2.** Because the plaintiff in this action is within the "core" of possible plaintiffs under § 16, we have no need to examine the outer limits of standing under this section, and this discussion should not be interpreted as adumbrating requirements that must be met by all § 16 plaintiffs.

order dated November 14. All motions for summary judgment were to be filed by November 15 and the hearing on the cross-motions was scheduled for December 19.

The announced timetable notwithstanding, on the day of hearing, both plaintiff and defendants arrived at the courthouse with additional papers pertaining to the cross-motions. Defendants, prior to the hearing, went to the clerk of court's office and filed a reply brief and affidavits. Plaintiff proceeded to the hearing and sought to file in open court affidavits supporting its opposition to defendants' motion for summary judgment. According to the clerk's minutes of the proceeding (no transcript is available), short statements were heard from each of the parties prior to the court's announcement of its decision to grant defendants' motion for summary judgment. Plaintiff requested permission to file affidavits but the court refused to accept them. Defendants then informed the court that they had filed a reply to plaintiff's opposition to summary judgment, but the court did not amend its earlier ruling rejecting plaintiff's affidavits or strike defendants' reply. Plaintiff claims that by this action, the court transgressed the requirements of Federal Rules of Civil Procedure 6(d) and 56(c), and that it was fundamentally unfair to allow defendants' papers, but not its own, to be filed on the day of hearing. Further, Caribe claims that once it accepted defendants' reply brief and affidavits, the court should have granted it time to respond to these papers before considering and ruling on the motions for summary judgment.

■ Rule 56(c) of the Federal Rules of Civil Procedure states that a motion for summary judgment is to be served at least ten days prior to the hearing. Under the requirements of Rule 6(d), if an affidavit is used to support a motion, it must be served with the motion. *Accord In re Stone*, 588 F.2d 1316, 1321 (10th Cir.1978); *Mount Vernon Preservation Society v. Clements*, 415 F.Supp. 141, 143 (D.N.H.1976); *see also* Moore's Federal Practice ¶ 56.14[1] at 56–358. The party adverse to the motion has a

more extensive period for filing affidavits, viz., "prior to the day of hearing [it] may serve opposing affidavits." Although Rule 56 does not create an explicit timetable for replies, the "purpose of Rule 56(c) is to allow a party to have a meaningful opportunity to challenge a summary judgment motion." *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 702 F.2d 107, 111 (7th Cir.1983); *Winbourne v. Eastern Airlines, Inc.*, 632 F.2d 219, 223 (2d Cir.1980).

■ In this case, defendants filed a reply brief and supporting affidavits which contained *new evidence;* one affidavit was by defendants' expert, Dr. Freyre, which set forth an analysis of the most recent data from the Puerto Rican Energy Department, and concluded that increased concentration and lessened competition had not occurred as a result of defendants' merger. While Federal Rule of Civil Procedure 6(b) allows "for cause shown" a discretionary enlargement of time, this discretion must not be exercised in a manner that prejudices the other party's substantial rights. The defendants here not only failed to show cause for not serving the affidavits with their motion, or at least by November 15, the date all motions for summary judgment were to be served, but the late affidavits plainly prejudiced plaintiff. As Judge Aldrich has explained, "[t]here is a substantial difference between accepting matters at the hearing which show that an issue of fact exists, and taking evidence in support of the motion at the last minute when there is no opportunity to rebut." *Chan Wing Cheung v. Hamilton*, 298 F.2d 459, 460 (1st Cir.1962). Defendants' affidavits and attachments filed on December 19, the day of hearing, should not have been considered. *Cf. Jones v. Mernard*, 559 F.2d 1282 (5th Cir.1977) (moving party's affidavit could not be served during oral argument on motion instead of being served prior to the date of hearing).

■ For similar reasons, we believe defendants' reply brief was also improperly before the court below. At oral argument, plaintiff informed us that it had requested an opportunity to respond to defendants'

reply brief, which it had received by hand on the day of hearing contrary to Rule 56(c). The district court refused to grant an opportunity to respond. The court then granted defendants' motion for summary judgment and stated that it was already drafting an opinion. When the opinion issued, it relied heavily on defendants' reply brief and supporting affidavits and even incorporated verbatim a number of consecutive pages directly from defendants' brief. Although a busy trial judge is entitled to obtain assistance from the parties, this heavy reliance on the moving party's brief and affidavits suggests that the district court failed to accord the nonmovant's papers the indulgence required. *Cf. Cuthbertson v. Biggers Brothers, Inc.*, 702 F.2d 454, 459 (4th Cir.1983) (extensive verbatim use of party's proposed findings of fact undercuts appearance of disinterested court). On motions for summary judgment, the indulgence required at both the trial and appellate levels mandates the court to review the record and draw all inferences in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Metropolitan Life Insurance Co. v. Ditmore*, 729 F.2d 1, 4 (1st Cir.1984); *Stepanischen v. Merchants Despatch Transportation Co.*, 722 F.2d 922, 928 (1st Cir.1983).

We believe that as the nonmoving party, Caribe should have had an opportunity to examine and reply to the moving party's papers before the court considered them in its decision process. This conclusion is especially required here because in its reply brief, the defendants advanced new reasons justifying summary judgment in their favor and relied on the untimely filed affidavits. Moreover, reply briefs were not authorized for either party under the district court's timetable. The district court therefore had two choices when it was informed that defendants had filed a reply brief: it could strike the brief or grant plaintiff as the nonmoving party the oppor-

tunity to respond to it. Certainly, after discovering that use of the information contained in the tardily served brief and affidavit would be helpful to its opinion, the district court should then have provided the nonmoving party with an opportunity to respond.

■ Whether the plaintiff as adverse party was entitled to have its affidavit accepted by the court presents a somewhat different question. As already noted, Rule 56(c) provides that an adverse party may file affidavits "prior to the day of hearing." Rule 6(d) restates this requirement with the modification that the court may "permit" an opposing party's affidavit "to be served at some other time." A district court's refusal to accept a late affidavit is reviewable only for abuse of discretion. *Accord Alghanim v. Boeing Co.*, 477 F.2d 143, 148–9 (9th Cir.1973). While the district court is not required to accommodate additional untimely submissions, we think that the trial court abused its discretion by allowing defendants' tardy submissions but declining to accept plaintiff's where neither party showed cause for the delay. The rules are structured to provide the nonmovant with substantially more time for filing affidavits than moving parties. Where no cause for the delay is shown by either party, we cannot discern any reason for the district court's reversal of the indulgence structurally provided to the nonmoving party by the Federal Rules. *Accord id.* (where moving party filed his affidavits two days after his motion, this is legitimate factor to be considered in determining whether court had abused its discretion in not allowing an extension of time for plaintiff to file affidavits in opposition). Accordingly, in evaluating the grant of summary judgment, we shall utilize only those portions of the court's opinion that do not rely on defendants' reply brief, affidavits, and other attachments. In this way, we deprive the defendants of the benefit of the procedural error.[3]

**3.** We must also note that the defendants were not alone in disregarding the Federal Rules of Civil Procedure. Our review of the record re-

veals that Caribe, too, was far from scrupulous in following the Rules. The cavalier attitude of the parties towards the Federal Rules of Civil

### B. *Oral Argument*

Oral argument on the cross-motions for summary judgment was calendared and the parties arrived prepared, but at the start of the hearing the district judge announced his decision in favor of defendants and declined to hear oral argument. Caribe urges us to hold that the district court erred in not having oral argument on defendants' motion for summary judgment. Inasmuch as we have concluded that the grant of summary judgment was wrong on the merits of the motion, this procedural point may well be academic. But, the matter arises with sufficient frequency in the trial courts that we believe a general statement of our views would be beneficial.

Rule 56(c) is again our text. It states in pertinent part: "The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits." Fed.R.Civ.P. 56(c). We note that at least five circuits have held that the rule's reference to a "hearing" does not necessarily imply oral argument; a matter can be heard simply on the papers. The Third, Fourth, Seventh, Eighth, and District of Columbia Circuits have held that oral argument may be dispensed with in appropriate circumstances. *See Spark v. Catholic University,* 510 F.2d 1277, 1280 (D.C.Cir.1975); *Ailshire v. Darnell,* 508 F.2d 526 (8th Cir.1974); *Season-All Industries, Inc., v. Turkiye,* 425 F.2d 34, 39 (3d Cir.1970); *United States Fidelity & Guaranty Co. v. Lawrenson,* 334 F.2d 464, 466–67 (4th Cir.), *cert. denied,* 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964); *Sarelas v. Porikos,* 320 F.2d 827 (7th Cir.1963), *cert. denied,* 375 U.S. 985, 84 S.Ct. 519, 11 L.Ed.2d 473 (1964); *cf. Hazen v. Southern Hills National Bank of Tulsa,* 414 F.2d 778, 780 (10th Cir.1969) (holding oral argument not required on motions in general unless a local rule provides otherwise). These circuits decline to displace the local rules promulgated under Federal Rule of Civil Procedure 78 that governs the submission and determination of motions without

oral argument. *Cf. United States v. One 1974 Porsche 911–S,* 682 F.2d 283, 286–87 (1st Cir.1982) (burden is on parties to request oral argument pursuant to local rules and, if not requested, argument is waived); *but see Dredge Corp. v. Penny,* 338 F.2d 456, 462 (9th Cir.1964).

■■■ We think this rule is sound. As those courts have recognized, ordinarily it is appropriate to hear oral argument before rendering summary judgment. But, the trial court has wide latitude in this regard. Where affidavits, depositions, and other documentary material indicate that the only issue is a question of law, and where the briefs have adequately developed the relevant legal arguments, it is not error to deny oral argument consistent with the district court's local rules. This antitrust action, however, as the next section will elaborate, presented a number of critical factual and fact-law questions. Given the posture of the case, we need not rule that it was error to refuse to grant oral argument. But, the case underscores the wisdom of hearing oral argument on motions bottomed on difficult questions of law and alleged questions of fact. It is likely that oral argument here would have highlighted the obstacles to a supportable summary judgment decision and resulted in the denial of the motion.

### IV. SUMMARY JUDGMENT

The standard for granting summary judgment is well established. Summary judgment is appropriate only when the pleadings and other submissions show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record in the light most favorable to the party opposing the motion, and indulge all inferences favorable to that party. *Adickes v. Kress & Co.,* 398 U.S. at 157, 90 S.Ct. at 1608; *Stepanischen v. Merchants Despatch Transportation Co.,* 722 F.2d at 928. Ap-

Procedure and the court's orders cannot be con- doned.

plying this standard, we find that there were disputed material issues of fact and that the court erred in its application of the law, which it adopted from defendants' brief.[4] Although these reasons are sufficient unto themselves for reversing the grant of summary judgment, the record also shows that the district court failed to grant plaintiff all favorable inferences suggested by the evidence and, instead, *weighed* the conflicting evidence, and did so in the light most favorable to the moving party.

The parties continually differed regarding a number of crucial facts at issue. They also bitterly contested the appropriate inferences to be drawn from the facts on which they were agreed. Examples of controverted facts and inferences include: whether competition has been increased or decreased by the merger; whether the Isla-GPR merger was an attempt to monopolize the gasoline market; whether gasoline is a homogenous product; whether it is likely Caribe will be "squeezed" from the market and, if so, whether this would be fairly traceable to the merger; whether the post-merger market share of Isla-GPR is sufficient to allow it to diminish competition; what the appropriate time frame is for analyzing the effects of the merger on the gasoline market; what the barriers to entry into this market are; and whether these barriers are significant deterrents to new entries.[5] Rather than denying the motion, the district court acted as a trier of fact. It assessed the challenged merger's impact upon competition in the gasoline market, it evaluated the statistical data available, and it compared and weighed the parties' expert testimony regarding a number of the other issues. This was not appropriate in ruling on a motion for summary judgment.

■ We now turn to the central error of law. Although the law governing each of the substantive claims must be applied with reference to the remedy requested, *see, e.g., Brunswick Corp. v. Pueblo Bowl-O Mat*, 429 U.S. 477, 486, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1979), the district court made use of the wrong remedial law. The sole remedy requested by Caribe was injunctive relief pursuant to Clayton Act § 16, yet the district court utilized the legal standards governing the recovery of treble damages under Clayton Act § 4. This was prejudicial error because the standards for relief under § 4 are substantially more stringent than those under § 16. Section 4 is retrospective in orientation; it seeks to remedy the past by penalizing wrongdoers with treble damages, thereby deterring other wrongdoing. *Id.* at 485, 97 S.Ct. at 695. Accordingly, § 4 "makes awards available only to *injured parties*, and measures the award by a multiple of the injury actually proved." *Id.* By contrast, § 16 is prospective and prophylactic, allowing injunctive relief upon demonstration of "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine*, 395 U.S. at 130, 89 S.Ct. at 1580. As we emphasized in our earlier discussion of plaintiff's "standing," the district court cannot require plaintiff to show *fact* of injury, *id.*, in an action under § 16. Summary judgment, therefore, was not and could not have been properly granted on the Sherman Act § 1 and § 2 claims and the Clayton Act § 7 claim.

■ Although the grant of summary judgment for defendants on the Clayton Act § 8 claim alleging that some of the defendant corporations have interlocking directorates is a closer question, that ruling must also be reversed. The district court held that § 8 did not apply because "the corporations Isla and GPR are separate entities in form only and [ ] they are truly

---

4. We note that, even if the defendants' late-filed affidavits are factored into the Rule 56 equation, the calculus remains unchanged; genuine issues of material fact nonetheless appear distinctly and in some abundance.

5. One of the few facts about which the parties did not disagree was the relevant geographic market—the island of Puerto Rico. Some disagreement may exist, however, on the existence of relevant geographic submarkets.

one merged corporation. There is no evidence to the contrary...." Caribe correctly points out that some contrary evidence may be found in an affidavit of Nelson Capote, chief operating officer of both GPR and Isla, dated October 31, 1983. Mr. Capote states:

At the time of the acquisition, GPR had its own middle management and lower organizational structure. ISLA, which was the Puerto Rican of [sic] ARCO Carribean, Inc., inhereted [sic] from it the existing middle management and lower organizational structure. For convenience of operation, I decided to maintain these two entities so as to be able to distinguish between the performance of each....

The district court grounded its ruling partly on a stipulation that the corporations had merged, but we find no such stipulation in the record. What we do find is plaintiff's statement of material facts at issue, appended to docket entry 91, which alleges that defendants are separate entities for purposes of § 8 but a single entity for § 7.

We venture no opinion now as to whether plaintiff can have it both ways but, ordinarily, such a statement could not constitute a stipulation. It may well be that there was an oral stipulation by Caribe upon which the district court relied. On the record before us, however, we must set aside the summary judgment granted defendants on plaintiff's claim under § 8 of the Clayton Act.

It is possible that the factual dispute can be settled with stipulations such that the question becomes one of law. Because the parties failed to cite the law relevant to determining the question, we draw attention to, *inter alia, T.R.W., Inc. v. F.T.C.,* 647 F.2d 942 (9th Cir.1981) (proof that interlock has actual anticompetitive effect is not required); *Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614 (9th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980) (where district court found that six entities owned and operated by one individual neither competed with

each other nor represented themselves as competitors, no violation of Clayton Act § 8); *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1205 (2d Cir. 1978) (§ 8 does not prohibit interlocking directorships between parent companies whose subsidiaries are competitors); *Protectoseal Co. v. Barancik,* 484 F.2d 585, 588–89 (7th Cir.1973) (Stevens, J.) (by § 8, Congress intended, *inter alia,* to prohibit interlocks between corporations that could not lawfully merge; § 8 has broader coverage than § 7); *In re Penn Central Securities Litigation,* 367 F.Supp. 1158, 1168 (E.D.Pa.1973); *Paramount Pictures Corp. v. Baldwin-Montrose Chemical Co.,* 1966 Trade Cas. (CCH) ¶ 71,678 at 82,065 (S.D.N. Y.1966); and more generally to *Bankamerica Corp. v. United States,* 462 U.S. 122, 128, 103 S.Ct. 2266, 2270, 76 L.Ed.2d 456 (1983); *Copperweld Corp. v. Independence Tube Corp.,* — U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Borg Warner Corp.,* 3 Trade Reg.Rep. (CCH) ¶ 22,663 (FTC 1983); ABA Section on Antitrust Law, Antitrust Law Developments (Second) 210–14 (1984); *Kramer, Interlocking Directorships and the Clayton Act After 35 Years,* 59 Yale L.J. 1266 (1950). The court below should, upon renewed motions for summary judgment or at trial, as the case may be, study the issues in the afterlight of these authorities.

## V. DIVESTITURE

■ We now turn to consider whether divestiture is excluded *per se* from the armory of equitable relief available to a district judge in § 16 cases. Caribe petitions solely for injunctive relief from defendants' antitrust violations and specifically requests an order directing USAP to divest itself of Isla Corporation, the former ARCO subsidiary. Caribe asserts that unless divestiture is ordered, the competitive conditions in the Puerto Rican retail gasoline market will be destroyed and the trend toward monopolization of the market will continue unabated. Such a result, it claims, would work a manifest detriment to Caribe and the other minority share companies.

The defendants contend that divestiture is not an authorized form of injunctive relief under § 16, standing solely upon the analysis set forth in *International Telephone and Telegraph v. GTE Corp.*, 518 F.2d 913, 921 (9th Cir.1975) (hereinafter *I.T.T.*), and reaffirmed in *Calnetics v. Volkswagen of America*, 532 F.2d 674 (9th Cir.1975), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976).[6] In its cases, the Ninth Circuit decided that the statutory language of § 16 authorizing private plaintiffs to sue for and obtain "injunctive relief" was ambiguous. It then concluded on the basis of the legislative history of the Clayton Act that Congress had not intended divestiture as one of the equitable remedies available to private plaintiffs under § 16.

Other courts, however, have concluded that divestiture is an available § 16 remedy. In *NBO Industries Companies, Inc. v. Brunswick Corp.*, 523 F.2d 262 (3d Cir. 1975), *rev'd on other grounds sub nom. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 the Third Circuit explicitly rejected both the Ninth Circuit's approach to the question and its conclusion, while deciding that divestiture was not an appropriate remedy in its case. Several district courts also provide support for Caribe's position. Most recently, in *Fuchs Sugar and Syrups, Inc. v. Amstar Corp.*, 402 F.Supp. 636 (S.D.N.Y.1975), and *Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016, 1025 (S.D.N.Y.1979), divestiture was held to be a remedy available to private plaintiffs suing for injunctive relief. Preceding these rulings were four district court opinions that reached the same conclusion, excluding, of course, the district courts the Ninth Circuit reversed in the two cases cited above. *See Bay Guardian Co. v. Chronicle Publishing Co.*, 340 F.Supp. 76, 82 (N.D.Cal.1972) (divestiture available for Clayton Act § 7 violation); *Credit Bureau Reports v. Retail Credit Co.*, 358 F.Supp. 780, 797 (S.D.Tex.1971) (divestiture available under § 16 generally), *aff'd*, 476 F.2d 989, 992 (5th Cir.1973); *Burkhead v. Phillips Petroleum Co.*, 308 F.Supp. 120, 126–27 (N.D.Cal.1970) (same); *Julius M. Ames Co. v. Bostitch, Inc.*, 240 F.Supp. 521, 526 (S.D.N.Y.1965) (same).

In view both of the split in authority, and of the long-range ramifications of a decision concerning the availability of divestiture as a potential remedy in a private antitrust suit, a comprehensive treatment of this question is necessary. Accordingly, our statutory construction of § 16 begins by recounting the general antitrust legislative background. We next turn to an analysis of the statute's plain language. Because the statutory language does not explicitly state whether Congress intended divestiture to be a remedy available to private plaintiffs, we examine the legislative history of the Clayton Act in some detail. We then consider the question in light of the goals the statutory language and legislative history enunciated. We conclude that § 16 encompasses divestiture.

### A. *Legislative Background*

In 1890, as a result of widespread alarm over concentration and anticompetitive conditions in the transportation, fuel and beef industries, Congress passed the Sherman Act. It prohibits, *inter alia*, "[e]very contract, combination, ... or conspiracy in restraint of trade," and every monopolization or attempt to monopolize. 15 U.S.C. §§ 1, 2 (1982). As the Supreme Court has observed,

The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time provid-

---

6. The Sixth Circuit adopted summarily the Ninth Circuit's position in *Langenderfer v. S.E. Johnson Co.*, 729 F.2d 1050 (6th Cir.), *cert. de-* *nied*, —— U.S. ——, 105 S.Ct. 510, 511, 83 L.Ed.2d 401 (1984).

ing an environment conducive to the preservation of our democratic political and social institutions.

*Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958).[7]

Despite the expansive language and broad remedial purposes of the Sherman Act,[8] it soon became apparent that the Act was an inadequate instrument for achieving some of the lofty goals Congress had identified. Chief among its deficiencies was its inability to obstruct and prohibit corporate integrations that could lead to future monopoly. To supplement the Sherman Act so as "to arrest the creation of trusts, conspiracies, and monopolies in their incipiency," S.Rep. No. 698, 63d Cong., 2d Sess. (July 22, 1914) (Judiciary Committee), Congress passed the Clayton Act, 15 U.S.C. §§ 12–27. Section 7 of the Clayton Act, 15 U.S.C. § 18, which originally provided that no corporation engaged in commerce shall acquire directly or indirectly the whole or any part of the stock of another corporation where the effect of such acquisition is to lessen competition substantially or tend to create a monopoly, was subsequently amended to extend its reach still farther. In 1950, § 7 was amended to encompass the acquisition of assets as well as of stock, and to apply unequivocally both to mergers between actual competitors and to mergers effected vertically or by conglomerates whose effect may tend to lessen competition. *See* 15 U.S.C. § 18 (1982) (as amended by Pub.L. No. 81–899, 64 Stat. 1125); *see*

also *Brown Shoe Co. v. United States*, 370 U.S. 294, 315–18, 82 S.Ct. 1502, 1518–20, 8 L.Ed.2d 510 (1962).

Private parties may sue to enforce the antitrust laws, including the substantive provisions of the Sherman and Clayton Acts, under § 4 and § 16 of the Clayton Act. Section 4 offers the successful private litigant treble damages, costs, and attorney's fees upon proving measurable injuries actually sustained. 15 U.S.C. § 15. Section 16, by contrast, provides injunctive relief to "any person, firm, corporation, or association ... against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. § 26. Section 16 has recently been amended to provide attorney's fees and costs to a prevailing plaintiff who receives injunctive relief. *Id.* (as amended by Pub.L. 94–435 (1976)). Courts have long recognized that Congress intended private antitrust suits both to provide a remedy to injured parties when the government fails to act or is not able to provide an adequate remedy, and to enlist the business public as private attorneys general to aid the government in "achieving the broad social object of the statute." *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 365 (9th Cir.1955); *see also Monarch Life Insurance Co. v. Loyal Protective Life Insurance Co.*, 326 F.2d 841, 845 (2d Cir. 1963), *cert. denied*, 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964).

### B. *Plain Language*

Our starting point in determining the scope of the injunctive relief available un-

---

**7.** At the time his bill was called for discussion on the floor of the Senate, Senator Sherman identified the impetus of the legislation later to be known as the Sherman Act:

The popular mind is agitated with problems that may disturb social order, and among them all none is more threatening than the inequality of condition, of wealth, and opportunity that has grown within a single generation out of the concentration of capital into vast combinations to control production and trade and to break down competition. These combinations already defy or control powerful transportation corporations and reach State authorities. They reach out their Briarean arms to every part of our country. They are imported from abroad. Congress alone

can deal with them, and if we are unwilling or unable there will soon be a trust for every production and a master to fix the price for every necessity of life.

21 Cong.Rec. 2460 (daily ed. March 21, 1890). *See generally* Katzmann, *The Attenuation of Antitrust*, 2 Brookings Rev. 23, 23–25 (1984) ("Antitrust reflected the deep-rooted and persistent American fear that concentrated private power could undermine democratic government").

**8.** Senator Sherman explained: "The first section, being a remedial statute, would be construed liberally, with a view to promote its object. It defines a civil remedy, and the courts will construe it liberally...." 21 Cong.Rec. 2456 (daily ed. March 21, 1890).

der § 16 is the statutory language. *North Haven Board of Education v. Bell*, 456 U.S. 512, 520, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1981); *Consumer Product Safety Commission v. GTE Sylvania Corp.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Id.; Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983); *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Section 16 provides:

> Any person, firm, corporation or association shall be entitled to sue for and *have injunctive relief,* in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, *when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity....*

15 U.S.C. § 26 (1982) (no amendment in pertinent part since original enactment) (emphasis added). The section further provides that a preliminary injunction may issue upon the posting of a bond if plaintiff shows the "danger of irreparable loss or damage is immediate...." *Id.*

We are first struck by the broad language Congress employed in § 16. "Injunctive relief" is made available "when and under the same conditions as injunctive relief against threatened conduct ... is granted by courts of equity." *Id.* Significantly, the statute states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order. " 'Nothing on the face of the statute suggests a congressional intent to limit [the types of injunctions a court may order].' " *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980) (quoting *United States v. Culbert*, 435 U.S. 371, 373, 98 S.Ct. 1112, 1113, 55 L.Ed.2d 349 (1978)). Rather, the statutory language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief.

The Supreme Court has described the principles of equity as derived from a "practice with a background of several hundred years of history." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591-2, 88 L.Ed. 754 (1944). The Court has noted, "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." Equity is the instrument "for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Id.; see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Because of the vital role of equity in our system of law,

> "this equitable jurisdiction *is not to be denied or limited in the absence of a clear and valid legislative command.* Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' *Brown v. Swann*, 10 Pet. 497, 503 [9 L.Ed. 508]."

*Weinberger v. Romero-Barcelo*, 456 U.S. at 313, 102 S.Ct. at 1803-04 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946)) (emphasis added). This directive clarifies the onerous burden that must be discharged for us to restrict the district court's inherent equity powers; in either the plain language of the statute, or in authoritative legislative history, a "clear and valid legislative command" must be identified.

Although "Congress may intervene and guide or control the exercise of the courts'

discretion,"[9] *Weinberger v. Romero-Barcelo*, 456 U.S. at 313, 102 S.Ct. at 1803; *see also Yakus v. United States*, 321 U.S. 414, 441–42, 64 S.Ct. 660, 675–76, 88 L.Ed. 834 (1944), the plain language of § 16 fails to indicate by either "a clear and valid legislative command," *Porter v. Warner Holding Co.*, 328 U.S. at 398, 66 S.Ct. at 1089, or even a veiled suggestion, any intended limitation of the types of injunctive relief available to private litigants under § 16. Nor do we find any indication of an intention to limit the district court's inherent powers of equity.[10] Accordingly, we believe Congress intended that courts should fashion their injunctions by exercising sound discretion according to the exigencies of the particular situation before them, which is to allow courts their "traditional equitable discretion." *Romero-Barcelo*, 456 U.S. at 319, 102 S.Ct. at 1806. It is reasonable to hypothesize that, in some aggravated cases, the threatened or actual injury to the market and a litigant will not cease unless the acquiring corporation is required to divest itself of its acquisition. The plain language of § 16 does not suggest that Congress intended to exempt from the district court's equity jurisdiction the power to order divestiture in appropriate cases brought by private plaintiffs.

Our conclusion is fortified by comparing the language Congress utilized in granting the government the power to obtain equitable relief, § 15 of the Clayton Act, 15 U.S.C. § 25, to that used in § 16. Section 15 vests the government with the power "to institute proceedings in equity to prevent and restrain" violations of the antitrust laws and allows it to petition "that such violation ... be enjoined or otherwise prohibited." 15 U.S.C. § 25. The predecessor statute to § 15, § 4 of the Sherman Act, contained language that the Congress reenacted virtually verbatim in § 15. The government's ability to seek and obtain divestiture or "dissolution" under this general language was clear by 1914, at the time the Clayton Act was passed. *See*

**9.** The Supreme Court has noted a number of "instances in which Congress has regulated and restricted the power of the federal courts to grant injunctions." *Yakus v. United States*, 321 U.S. 414, 442 n. 8, 64 S.Ct. 660, 676 n. 8, 88 L.Ed. 834 (1944). *See, e.g.,*

section 16 of the Judiciary Act of 1789, 1 Stat. 82, Judicial Code § 267, 28 U.S.C. § 384, denying relief in equity where there is adequate remedy at law; section 5 of the Act of March 2, 1973, 1 Stat. 334, Judicial Code § 265, 28 U.S.C. § 379, prohibiting injunction of state judicial proceedings; Act of March 2, 1867, 14 Stat. 475, 26 U.S.C. § 3653, prohibiting suits to enjoin collection or enforcement of federal taxes; the Johnson Act of May 14, 1934, 48 Stat. 775, 28 U.S.C. § 41(1), restricting jurisdiction to enjoin orders of state bodies fixing utility rates; Act of Aug. 21, 1937, 50 Stat. 738, 28 U.S.C. § 41(1), similarly restricting jurisdiction to enjoin collection or enforcement of state taxes; section 17 of the Act of June 18, 1910, 36 Stat. 557 and § 3 of the Act of Aug. 24, 1937, 50 Stat. 752, 28 U.S.C. §§ 380 and 380(a), requiring the convening of a three-judge court for the granting of temporary injunctions in certain cases and allowing a temporary restraining order by one judge only to prevent irreparable injury; the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C. §§ 101–15, regulating the issue of injunctions in labor disputes and prohibiting their issue "contrary to the public policy" declared in the Act.

*Id.*

**10.** At the time the Clayton Act was passed, a split in authority existed among the circuits regarding the availability of injunctive relief to a private party suing under the Sherman Act. Although the Sherman Act expressly conferred the power to initiate "proceedings in equity" for injunctive or other equitable relief only upon the government, the Sixth Circuit affirmed a case where the district court had granted a preliminary injunction to a private party pursuant to its inherent powers of equity. Through the injunction, the court had forbidden an acquiring corporation to vote the stock of its new acquisition, and then, after trial, had dissolved the injunction and dismissed the bill. *See Bigelow v. Calumet & Hecla Mining Co.*, 155 F.2d 869 (W.D.Mich.1907), *aff'd*, 167 F. 704 (6th Cir. 1909). The Second Circuit, however, held that injunctions were not available to private parties under the Sherman Act. *See Greater New York Film Rental Co. v. Biograph Co.*, 203 Fed. 39 (2d Cir.1913) (by implication). These cases, and the question whether inherent powers of equity were withdrawn from the courts under the Sherman Act, were discussed in the committee hearings. *See* Senate Hearings at 629–31 (issue and cases); House Hearings at 485–87 (case), 963–64 (issue but not cases). In view of these discussions, it is noteworthy that no exclusion of inherent powers of equity, or of certain kinds of injunctive relief, was included in the Clayton Act.

*United States v. American Tobacco Co.*, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). That Congress knew of the use of these remedies by the government under this broadly-phrased language is clear from the discussion of these cases during the hearings and debate on the Clayton Act. *See infra* at 419.

We are unable to discern from the plain language of these statutes any intended distinction between the equitable remedies Congress provided to the government and those it provided to private plaintiffs. The Ninth Circuit, however, determined that "proceedings in equity" (§ 15) and "injunctive relief" (§ 16) were not coextensive in their embrace of divestiture and dissolution. *I.T.T.*, 518 F.2d at 923–24. Although that opinion appears to concede that divestiture is within the ambit of "injunctive relief" as presently conceived and practiced, the Ninth Circuit declined to take the currently recognized scope of possible injunctions as its guidepost for determining the kinds of remedies available under § 16. It, instead, apparently believed that the proper inquiry was the meaning of the words employed in 1914, at the time of enactment. The Ninth Circuit identified what it considered to be a significant distinction between injunctive relief and dissolution or divestiture current at that time, and concluded that divestiture is not available under § 16.

Although ascertaining the intent of Congress is a court's primary objective in construing a statute, we disagree with the Ninth Circuit's interpretive approach. We do not believe that a court can ignore the contemporary legal meaning and scope of words employed in statutes and base its interpretation of the plain language solely on what it surmises was the meaning of the words at the time of original enactment. *See generally* Brest, *The Misconceived Quest for the Original Understanding*, 60 B.U.L.Rev. 204 (1980). Just as the concepts of "discrimination" and "equal protection of the laws" are susceptible of varying interpretations that change over time, *University of California v. Bakke*, 438 U.S. 265, 284, 98 S.Ct. 2733, 2745, 57 L.Ed.2d 750 (1978) (Powell, J., announcing the judgment of the Court), so, too, are other words, such as "injunctive relief," that are invested with legal meaning. We must recognize, as Justice Holmes so perceptively stated, that "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). Especially in view of the growth and change of equity powers and injunctive relief over the centuries,[11] and Congress' general authorization of "injunctive relief" with no restrictions or exceptions, we believe it is inappropriate to interpret this statute's language restrictively. We are, moreover, specifically charged to interpret a remedial statute generously. *See Gomez v. Toledo*, 446 U.S. 635, 639, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Doe v. Brookline*, 722 F.2d 910, 919 (1st Cir.1983). Because the Ninth Circuit based most of its determination of the 1914 meaning of "injunctive relief" on the comments made in the legislative history, we reserve our specific critique for our discussion of those materials. We now turn to that analysis.

### C. *Legislative History*

The legislative history of the Clayton Act is voluminous, comprising approximately 3000 pages of committee reports, hearings, and debate. This unusual breadth of attention found its impetus in the widespread public perception that trusts and monopolistic corporations possessed excessive economic, political, and social power, and that government action in this area was necessary to remedy the problem. *See* Katzmann, *The Attenuation of Antitrust*, 2

---

**11.** The evolution of judicial powers of equity was a subject before congressional committee hearings on the Clayton Act and its unsuccessful precursors. *See, e.g.*, Senate Hearings at 1091–95 (witness Samuel Gompers); 1130–1163.

Brookings Rev. 23, 23–25 (1984). The political significance of the issue is evinced by President Wilson's 1914 State of the Union address; his sole topic was to propose in general terms legislation to supplement the Sherman Act. 51 Cong.Rec. 1964–65 (daily ed. Jan. 20, 1914).

Following the President's address, a subcommittee of the House Judiciary Committee was appointed to draft legislation along the lines proposed by the President. That drafting process consumed approximately two weeks, and the result was styled a "tentative bill by Mr. Clayton." Although the Judiciary Committee reported one bill to the House, H.R. 15657, the subcommittee proposal was initially contained in three separate "committee print" bills which were published in newspapers throughout the country with an express invitation to the public, especially "businessmen," to testify at the House hearings or to otherwise contact committee members with comments. The bulk of the committee hearings and other commentary was devoted to four issues: determining what substantive offenses should be expressly prohibited; the proper reach of the interlocking directorates proscription; suggested restrictions on the use of federal injunctions against striking workers; and a reform of the criminal contempt process.

Before turning to our analysis of specific legislative materials, we must explore one additional interpretive problem. At no point in the legislative history of the Clayton Act do we find any use of the term "divestiture." Consequently, any inquiry into the intent of Congress regarding the availability of divestiture is at least one step removed; the inquiry must focus on other terms used at that time, such as "dissolution" and "partition," in an effort to ascertain the relationship between these concepts and "divestiture."

Defendants rely on the analysis set forth by the Ninth Circuit on this question. That court ruled that "the terms 'dissolution' and 'divestiture' are not interchangeable," *I.T.T.*, 518 F.2d at 923 n. 49, but that " 'dis- solution' is the inclusive term and 'divestiture' is a subcategory." *Id.* at 923. The crux of this argument is found in the following passage:

During the hearings on § 16, the members of the House Judiciary Committee used "dissolution" to include the remedy of divestiture. Throughout the hearings references were made by members of the committee and witnesses to "dissolution of the trusts." One of the more frequently mentioned trusts whose "dissolution" was discussed was the Standard Oil Trust. The Committee was intimately familiar with the Supreme Court's decision "dissolving" the Standard Oil Trust. If any specific equitable remedy was in the minds of the members of the committee when they were considering the right to bring dissolution suits, then it was the remedy obtained by the government in the Standard Oil case.

That remedy was divestiture.... In short, the dissolution of Standard Oil Co. of New Jersey was accomplished by an order that it divest itself of the stock of the subsidiary corporations. In that case, the Supreme Court used the term "dissolution" to refer to the remedy of divestiture.

*Id.* at 923–24 (footnotes omitted).

We agree with the Ninth Circuit that one starting point in understanding what Congress meant by the term "dissolution" is the antitrust experience in the opinion issued in *Standard Oil v. United States*, 221 U.S. at 77–81, 31 S.Ct. at 522–524. But we would add that the companion opinion of *United States v. American Tobacco Co.*, 221 U.S. at 184–88, 31 S.Ct. at 650–51, the district court opinion and decree in *Standard Oil*, 173 Fed. 177 (E.D.Mo.1909), which the Supreme Court affirmed, and the order for relief on remand in *American Tobacco*, 191 Fed. 371 (S.D.N.Y.1911), also were explicit parts of this experience, figuring in congressional discussions on whether the power to order relief, and the relief actually ordered, was sufficient.[12]

---

12. *See, e.g.*, 51 Cong.Rec. 9090 (daily ed. May 22, 1914) (remarks of Rep. Mitchell); at 9169 (daily

These cases were continually referred to both by Members of Congress and by witnesses when speaking of "dissolution." [13] To discern the meaning and scope of that term we look to the historical framework within which it was used.[14]

During the late nineteenth century, when monopolistic corporate power was at its height, state courts of equity,[15] and eventually federal courts, refashioned traditional equitable powers in order to do "complete justice" in the face of this new evil. The power to dissolve a partnership, upon petition of a partner, or to dissolve and wind up a corporation, evidently were the old equity powers gradually remolded into the antitrust power of dissolution.[16] This was a period of judicial creativity in adapting the traditional tools of the court when necessary to achieve the statutory goals enunciated by the Sherman Act.[17]

The Supreme Court had explicitly approved the use of "dissolution" as a remedy available under § 4 of the Sherman Act in the *American Tobacco* and *Standard Oil* cases. In *American Tobacco*, the Court observed: "[this case] involves difficulties in the application of remedies greater than have been presented by any case involving the Antitrust Act which has been hitherto considered by this court." *American Tobacco Co.*, 221 U.S. at 185, 31 S.Ct. at 650. In stating the considerations which brought it to that conclusion, the Court observed that a "mere decree forbidding stock ownership by one part of the combination in another part ... would afford no adequate measure of relief, since the ingredients of the combination would remain unaffected, and *by the very nature and character of their organization* would be able to continue the wrongful situation *which it is our duty to destroy.*" *Id.* at 185–86, 31 S.Ct. at 650–51 (emphasis added). To achieve this goal, the Court noted that it might

> resort to one or the other of two general remedies—*a,* the allowance of a permanent injunction *restraining the combination ... from continuing to engage in interstate commerce until the illegal situation be cured, ... or, b,* to direct the appointment of a receiver to take charge of the assets and property ... of the combination ... for the purpose of preventing a continued violation of the law, and thus *working out by a sale of the property of the combination.*

*Id.* at 186–187, 31 S.Ct. at 651 (emphasis added). Rather than ordering either of these two means of effectuating a dissolution, the Court directed that, on remand,

---

ed. May 23, 1914) (remarks of Rep. Nelson); at 16326 (daily ed. Oct. 8, 1914) (remarks of Rep. Nelson); H.R. No. 627, 63d Cong., 2d Sess. 648, 652, 689–90 (remarks of witness Louis Brandeis); at 666 (Rep. Nelson) (1914) (hereinafter House Hearings).

**13.** *See, e.g.,* the discussions identified in note 10 *supra;* House Hearings at 263 (Rep. Floyd); at 273 (Rep. Nelson); 331 (Rep. McCoy); 51 Cong. Rec. at 15821–23 (Sept. 28, 1914) (Sen. Reed); at 15864 (Sept. 29, 1914) (Sen. Reed); at 15864–5 (Sept. 29, 1914) (Sen. Overman).

**14.** As Arthur Corbin observed, a "word appearing suddenly, in empty space and with no history, would express nothing at all. To be expressive of any meaning, all words must have a context and a history...." 3 Corbin, Contracts 90 (1960).

**15.** Injunctive relief had regularly been sought and awarded to private plaintiffs under state antitrust laws and in common law suits alleging restraint of trade and price fixing. *See, e.g.,* *Gibbs v. Consolidated Gas,* 130 U.S. 396, 9 S.Ct. 553, 32 L.Ed. 979 (1889) (price fixing agreement).

**16.** During the House hearings, a famous antitrust lawyer of the day, Louis Brandeis, suggested remolding the power to order a "partition." Brandeis stated his belief that the courts already had this power—the power to order the division and sale of assets—but that it was doubted by some members of the judiciary, as evidenced by the *American Tobacco* opinion on remand, *see* 191 Fed. 371 (S.D.N.Y.1911), and was not utilized as broadly as it should. Brandeis proposed that Congress "educate" the courts and facilitate achievement of the antitrust goals by passing statutes specifically authorizing the use of this and other equitable powers in the antitrust context. *See* House Hearings at 652.

**17.** Other traditional equitable tools, specifically the injunctive power, were refashioned for the purpose of quelling labor strikes and boycotts. *See generally* F. Frankfurter & N. Greene, *The Labor Injunction* (1930).

the trial court hear the parties and fashion a plan "of dissolving the combination and of recreating, out of the elements now composing it, a new condition which shall be honestly in harmony with and not repugnant to the law." *Id.* at 187, 31 S.Ct. at 651.

We think this discussion in *American Tobacco* indicates that the Supreme Court envisioned a dissolution being accomplished in any of several ways. The combination's market power could effectively be dissolved by a prohibitory injunction forbidding the corporation from engaging in interstate commerce, with the result that the offending combination partitions itself, sells assets, or otherwise restricts itself in a manner that recreates a competitive market. Or, the court could take a more active role as by appointing a receiver to sell assets in such a manner as to restore market conditions. Or, in lieu of either of these two drastic remedies, the court could encourage the formulation of a consent decree under the direction of the court. All of these approaches may be called dissolutions—dissolutions of market power, of combinations of assets, or of the corporation itself. Today, as then, we would say that dissolutions achieved through the use of any of these mechanisms were achieved by use of the injunctive power according to principles of equity, *see, e.g., United States v. Standard Oil Co.*, 173 Fed. 177, 192–93 (E.D.Mo.1909), *aff'd*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); O. Fiss, The Civil Rights Injunction 10 (1978). Forcing a cor-

poration to divest itself of some of its assets, as by a sale, is one means through which the remedy of dissolution could be achieved, but it plainly is not the only means. *See* Adams, *Dissolution, Divorcement, Divestiture: The Pyrric Victories of Antitrust*, 27 Ind.L.J. 1 n. 1 (1951) ("The term 'dissolution' is generally used to refer to any situation where the dissolving of an illegal combination or association is involved, including the use of divestiture and divorcement as methods of achieving that end") (quoting Oppenheim, Cases on Federal Antitrust Laws 885 (1948)).

Moreover, when the Second Circuit, on remand in *American Tobacco*, fashioned relief according to what it conceived to be mandated by the Supreme Court's order for "dissolution," some members of Congress considered this not to be a dissolution in fact, but merely a "circuitous course" by which that end was not achieved. *See, e.g.*, 51 Cong.Rec. 16326 (daily ed. Oct. 8, 1914) (remarks of Rep. Nelson); 51 Cong.Rec. 15864 (daily ed. Sept. 29, 1914) (remarks of Sen. Reed).[18] These congressmen apparently equated dissolution with the complete destruction and reorganization of an offending corporation: a court should "cause all of its assets to be sold in such a manner ... as to restore competition ... fully and completely...." 51 Cong.Rec. 16326 (daily ed. Oct. 8, 1914) (remarks of Rep. Nelson). Thus, even within Congress, there existed a difference of opinion as to what the remedy of dissolution entailed.[19] We, therefore,

---

18. Evidently this perspective was shared by some officials in the Justice Department. *See* 51 Cong.Rec. 15864 (daily ed. Sept. 29, 1914) ("The fundamental weakness in the enforcement of the antitrust act in previous administrations was the failure to insist upon a real dissolution of monopolies and combinations which the courts had adjudged unlawful") (excerpt from Justice Dept. letter quoted by Sen. Reed).

19. It appears that over the years the legal meaning of the concepts "dissolution" and "divestiture" has become somewhat more settled than in 1914, so much so that the Supreme Court has recently pronounced them to be a "large degree interchangeable." *United States v. du Pont & Co.*, 366 U.S. 316, at 330 n. 11, 81 S.Ct. 1243, at 1252 n. 11, 6 L.Ed.2d 318 (1961). In reviewing the Court's cases, we found that the term "disso-

lution" tended to be used when ordering a remedy for violations of § 1 and § 2 of the Sherman Act, but not for Clayton Act § 7 violations. *See, e.g., United States v. Reading Co.*, 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760 (1920) (dissolution); *United States v. Lehigh Valley R.R.*, 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253 (1920) (same); *United States v. Southern Pacific Co.*, 259 U.S. 214, 42 S.Ct. 496, 66 L.Ed. 907 (1922) (same). This was especially true for the older cases. "Divestiture" of some assets or interests was frequently ordered as a part of the remedy of dissolution, *see, e.g., United States v. Crescent Amusement Co.*, 323 U.S. 173, 189, 65 S.Ct. 254, 262, 89 L.Ed. 160 (1944) (Sherman Act §§ 1, 2); *Schine Chain Theatres v. United States*, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948) (same); *International Boxing Club of New York v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959)

find the relationship between the terms "dissolution" and "divestiture" more complex than defendants would have it, and we cannot in good faith simply substitute the latter term for the former in reviewing the legislative history.

We now turn to an analysis of the legislative materials. It bears repeating that in order to limit or displace the meaning of a statute's plain language, authoritative legislative history that rises to the level of "a clearly expressed legislative intent" must be identified. *Consumer Products Safety Commission v. GTE Sylvania Corp.*, 447 U.S. at 108, 100 S.Ct. at 2056; *United States v. Turkette*, 452 U.S. at 580, 101 S.Ct. at 2527. Moreover, to restrict a court's inherent powers of equity, we must have nothing less than "a clear and valid legislative command." *Weinberger v. Romero-Barcelo*, 456 U.S. at 313, 102 S.Ct. at 1803. Defendants' legislative arrows lack the velocity to reach either mark.

1. Committee Reports

In reviewing the legislative process, we first look to see whether Congress specifically addressed the question in the official committee reports, which are entitled to substantial weight. The House Judiciary report does not speak to whether § 16 was meant to encompass dissolution or divesti-

ture. Its explanation of § 16 essentially reiterates the text of that provision and states that it was aimed at remedying a defect in prior law which had enabled private parties to recover damages but not injunctive relief. H.Rep. No. 627, 63d Cong., 2d Sess. 22 (1914) (hereinafter House Report). The report fails to identify any intended limits on the scope of injunctive relief available to private parties.

Somewhat more revealing is a House minority report from the Judiciary Committee, in which some committee members dissatisfied with the bill expressed their reservations about the broad scope of private relief authorized by § 16: [20]

The provision giving to any individual the right to enjoin any threatened loss or damage is a serious one. . . . The beginning of an investigation by the government on any complaint that a concern has violated the antitrust laws almost immediately to some extent affects his credit but not so seriously as an *injunction and perhaps receivership which might be brought by an individual.*

Minority Views, pt. 2 to H.R. 15637, H.Rep. No. 627, 63d Cong.2d Sess. (1914) (emphasis added). The specific reference to receivership suggests that some committee members believed dissolution and corporate reorganization would fall within the scope of § 16 "injunctive relief." [21]

(same). These last three cases clarify that a distinction between the two terms was felt at one time. In *Schine Theatres*, the Court stated: "The plan does not provide for the dissolution of the Schine circuit through the separation of the several affiliated corporations as was done in [*Crescent Amusement*]. It keeps the circuit intact in that sense but requires Schine to sell certain theatres. . . . Schine is to be divested of more than 50 of its theatres." 334 U.S. at 126–27, 68 S.Ct. at 956. And again, our view that "dissolution" tends to be ordered where monopolies and restraints of trade are found, and has as one of its essential elements a major judicial reorganization of the corporation, is supported by *International Boxing.* There, the Court ordered dissolution of the combination, recognizing that new corporations would be formed to handle the business formerly transacted by the combination. The Court further noted that "dissolution might well have the salutary effect of completely clearing new horizons that the trial judge was attempting to create in the boxing

world, especially when effected *in conjunction with* the stock divestiture provision." 358 U.S. at 260–61, 79 S.Ct. at 255 (emphasis added).

**20.** Section 16, 15 U.S.C. § 26, was originally § 13 of the proposed Clayton Act. Although most of the legislative history speaks in terms of § 13, we shall avoid confusion by referring to the provision as § 16.

**21.** While the fears and doubts of the minority are not an authoritative guide to the construction of legislation, *see Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 394, 71 S.Ct. 745, 750, 95 L.Ed. 1035 (1951), their report did comprise the only specific explanation of the meaning of the private injunction provision that was readily accessible to the whole Congress. Moreover, the Supreme Court has consistently favored the "presumably well considered and carefully prepared committee report" over informal or casual statements made

The report from the Senate Committee on the Judiciary does not shed much, if any, additional light on our particular inquiry. The report's preface announces that the bill's purpose "is only to supplement" the Sherman and other antitrust provisions. S.Rep. No. 698, 63d Cong., 2d Sess. 1 (1914) (hereinafter Senate Report). It "seeks to prohibit and make unlawful certain trade practices which, as a rule," are not presently illegal, "and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation." *Id.* The Senate report then reproduced in its entirety the House report on the proposed Clayton Act.

The Senate committee proposed several amendments to the bill, including amendments to § 16. In particular, the committee sought to make the injunctive relief section apply specifically to four named sections of the bill, "so that all doubt of the cumulative and not exclusive character of the remedy may be removed." [22] Plainly, none of this material evinces a congressional intention that § 16 injunctive relief have restrictions placed upon it beyond the principles traditionally governing a court sitting in equity.

### 2. Floor Debates

The House began its consideration of H.R. 15657 in early May, 1914. 51 Cong. Rec. 8201 (daily ed. May 6, 1914). Although Representative Clayton, the chair of the House Judiciary Committee, did not participate in the floor debates, his coauthors of the bill, Representatives Carlin and Floyd, and other committee members were actively involved in explaining the bill to their colleagues. Committee Member McGillicuddy, on behalf of the committee, discussed the purpose of § 16:

> Under the [Sherman Act] any person injured in his business or property by acts in violation of the [Act] ... is entitled to recover threefold damage whenever he is able to prove his case. There is no provision under the present law, however, to prevent threatened loss or damage even though it be irreparable. The practical effect of this is that a man would have to sit by and see his business ruined before he could take advantage of his remedy. In what condition is such a man to take up a long and costly lawsuit to defend his rights?
>
> The proposed bill solves this problem for the person, firm, or corporation threatened with loss or damage to property by *providing injunctive relief against the threatened act that will cause such loss or damage. Under this most excellent provision a man does not have to wait until he is ruined in his business before he has his remedy.*

51 Cong.Rec. 9261 (daily ed. May 26, 1914) (emphasis added). Representative McGillicuddy mentioned no limitations on the injunctive power either he or the committee understood to be implied by § 16.

Later that same day, in response to criticism that the bill lacked substance, Representative Carlin took the floor in defense of the bill and said:

> First, we found that the Sherman law did not permit an injunction on petition of an individual. *The Government could enjoin a combination or trust;* and though an individual was standing face to face with destruction, though the monster of monopoly was knocking at his door, he would have to wait until destruction came, and then pursue his remedy at law for treble damages. So ... the committee, proposed to place in this bill *a law which allows the individual to sue for equitable relief and to enjoin* monopoly when he is threatened with irreparable loss or damage.

---

in the course of the legislative process. *Id.* at 396, 71 S.Ct. at 751 (Jackson, J. concurring); *United States v. Auto Workers,* 352 U.S. 567, 585, 77 S.Ct. 529, 538, 1 L.Ed.2d 563 (1957); *United States v. Public Utilities Commission,* 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020 (1953).

**22.** The Senate committee also sought to delete the exception for common carriers the House had provided in § 16, although it ultimately failed to do so.

*Id.* at 9270 (emphasis added). After drawing this express parallel between the government's and the individual's right to enjoin antitrust violations, Representative Carlin then outlined other protections for the individual contained in the bill. In particular, he named the right to use a governmentally obtained judgment as evidence in a private suit, and the suspension of the statute of limitations for individuals while a pertinent government suit is pending. All these remarks indicate a desire to provide the individual with effective remedies against anticompetitive practices, and to permit early intervention to protect a business and market.[23] The House passed the committee's bill without amendment.

As noted above, the Senate committee's bill contained a number of amendments differentiating it from the House bill. On the floor of the Senate, still more amendments were passed. One such amendment passed by the Senate, § 25, is pertinent to our inquiry:

That whenever a corporation shall acquire or consolidate the ownership or control of the plants, franchises or property of other corporations, copartnerships, or individuals, so that it shall be adjudged to be a monopoly or combination in restraint of trade, the court rendering such judgment shall decree its *dissolution* and shall *to that end* appoint receivers to *wind up its affairs and shall cause all of its assets to be sold* in

such manner and to such persons as will, in the opinion of the court, restore competition as fully and completely as it was before said combination began to be formed. The court shall reserve in its decree jurisdiction over said assets so sold for a sufficient time to satisfy the court that full and free competition is restored and assured.

51 Cong.Rec. 15863 (daily ed. Sept. 29, 1914) (emphasis added). We note that the amendment was the only explicit proposal for the codification of the dissolution remedy, and that the amendment's plain language would not have restricted its availability to the government. The Senate approved this amendment and passed the bill. When the bill was returned to the House, a call was made for a conference committee to resolve the differences between the two bills. While this amendment was rejected by the conference committee and ultimately not enacted, we believe that it indicates greater conflict over the meaning of "dissolution" than the Ninth Circuit acknowledges. Plainly, a number of Senators appear to have connected "dissolution" with the winding up of a corporation, or its general termination.[24]

### 3. Conference Committee Reports

Both the Senate and the House issued conference reports, but neither mentioned the Senate amendment except to note that

---

**23.** Representative Carlin then turned to clarify the relaxed standard for anticompetitive practices under the bill:

The Sherman law in its operation is limited to three things: First, a contract or combination in the form of a trust or otherwise; second, a conspiracy in restraint of trade; third, an attempt to monopolize. There is nothing about competition in the Sherman law. There must be actual restraint of trade under the Sherman law to bring anyone under either its civil or criminal process.

Under this bill there has to be only a lessening of competition. Competition may be lessened without restraint of trade. Competition may be lessened without attempt to monopolize. Competition may be lessened without conspiracy. It may be the natural effect of the putting together in close relationship through a holding company of two corporations that are natural competitors, or ought to

be. Yet there would not be restraint. So instead of subtracting from the Sherman law, ... we have added to the Sherman law a most effective rule by which the actions of these combinations in the future may be determined....

51 Cong.Rec. 9271 (daily ed. May 26, 1914).

**24.** The author and prime proponent of the Senate amendment expressed his view of a dissolution:

Wh[at] I propose [is] that we shall have a real decree, that there shall be a real burial, and that we shall sod down the grave upon the monster that was created in defiance of law, but that we shall at the same time preserve its parts and restore them to competition and activity....

51 Cong.Rec. 15864 (Sept. 29, 1914) (remarks of Sen. Reed).

the Senate "recede[s]." H.Rep. No. 1168, 63d Cong., 2d Sess. 1 (1914); S.Doc. No. 585, 63d Cong., 2d Sess. 3 (1914). It is unclear what inferences should be drawn from the conference's rejection of § 25. One position that could be advanced is that because § 25 was rejected by the committee and ultimately not enacted, Congress explicitly rejected dissolution as a remedy available to private plaintiffs. Such an argument, however, fails to take into consideration that both the government and private plaintiffs would be swept within such an inferred intention because the amendment did not differentiate between types of plaintiffs. We would also note that rejection of § 25 has not obstructed the government from obtaining divestiture in appropriate cases. *See, e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. E.I. du Pont de Nemours,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Because a significant number of substantive provisions were contained within § 25, including, *inter alia,* the authorization of dissolution with no restrictions as to type of plaintiff, we apprehend no reason for assigning the rejection of the amendment to a congressional decision that dissolution should be restricted to the government's cases alone. This perspective receives additional support from a comparison between the Senate amendment and the alternative language pressed upon the conference committee. This alternative would have made it permissive rather than mandatory for a court to order the sale of all assets when a Sherman Act § 1 or § 2 violation was found, and would have restricted the availability of dissolution to the government. This alternative language, too, was rejected by the conference. *See* 51 Cong.Rec. 16325–26 (Oct. 8, 1914) (remarks of Rep. Nelson, conference committee member).

### 4. Floor Debates on the Conference Bill

Representative Floyd, one of the conference members, explained the conference bill to the House:

> Heretofore there has been *only one power that might enjoin an unlawful trust or monopoly in restraint of trade, and that was the Government of the United States....*
>
> This provision in § 16 gives any individual, company, or corporation damaged in its property or business by the unlawful operations or actions of any corporation or combination the right to go into court and enjoin the doing of these unlawful acts....

51 Cong.Rec. 16319 (Oct. 8, 1914) (emphasis added). We note that Representative Floyd reiterated the explicit parallel drawn between the government's power to obtain an injunction and that of the individual under § 16 of the Clayton Act, a point which had originally been elaborated by Representative Carlin during floor debates on the initial bill. Again, no distinction between the two authorizations was noted.

### 5. Committee Hearings

We review the committee hearings last because these are entitled to less weight than committee reports, *United States v. Auto Workers,* 352 U.S. 567, 585, 77 S.Ct. 529, 538, 1 L.Ed.2d 563 (1957), and remarks on the floor by a bill's sponsor which are entitled to substantial weight. *North Haven Bd. of Educ. v. Bell,* 456 U.S. at 526–27, 102 S.Ct. at 1920–21; *FEA v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976).

When reviewed as a whole, only scant consideration was given in the hearings to the remedy provisions, or the judicial "machinery," of the proposed act. In House hearings that lasted over four months and filled over 2000 pages of record, the testimony relating specifically to the scope of § 16 is contained in approximately thirty pages. The Ninth Circuit accorded particular weight to an exchange between Representative Floyd and a witness who testified at the committee's request. The witness commented "when a private individual is allowed to begin a suit to dissolve a corporation, or an injunctive suit, the same kind of suit the Government may begin...." H. Hearings on H.R. 15657, 63d Cong., 2d Sess. 842 (February 6, 1914) (hereinafter H.

Hearings). Mr. Floyd, one of the members of the drafting subcommittee, responded:

We did not intend by section [16] to give the individual the same power to dissolve the corporation that the Government has.... We discussed it very thoroughly among ourselves and decided he should not have [it].

*Id.* (remarks of Rep. Floyd).

We think the context of the remark belies any idea that the committee had arrived at an understanding about the intended scope of § 16. Just a few days prior to the time this remark was made, a national invitation had been issued for citizens to comment on the bill and elaborate their views regarding its proper scope. On the day the comment was made, the hearings had been in session barely one week. It is difficult to believe that a committee intention had been formed at this early stage. This perception is borne out by the repeated inquiries committee members made of other witnesses on later dates regarding whether individuals should have a right to obtain the dissolution of an offending corporation. *See, e.g.,* House Hearings at 492 (Feb. 12, 1914); *id.* at 666 (Feb. 16); *id.* at 1183 (March 4).[25]

Additionally, a close reading of the Floyd remarks shows that he stated there was no intent to give the individual the *same* power to bring a suit to dissolve a corporation that the government was intended to possess. We cannot ascertain whether Representative Floyd intended that the individual should have the power to request and obtain dissolution in certain kinds of cases but not others, for instance, in especially egregious cases or upon more stringent proof than the government. Moreover, congressional members' comments during committee hearings while interviewing witnesses may indicate preliminary concerns and issues but generally are not weighted as representative of the intent of Congress embedded in the proposed statute eventually reported to the floor. Having considered these aspects of Representative Floyd's remarks, we hold them to be insufficiently reliable for a court to give them interpretive weight in construing § 16. *See New England Power Co. v. New Hampshire,* 455 U.S. 331, 342, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982) ("Reliance on such isolated statements of legislative history in divining the intent of Congress is an exercise fraught with hazards, and 'a step to be taken cautiously' ") (quoting *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977)).

Finally, regardless what weight is accorded these remarks, we note that Representative Floyd rejected the individual's power to bring a suit for *dissolution* of a combination. As divestiture of an acquisition can be so different in degree of impact on a combination as to amount to a difference in kind, we cannot hold these remarks to indicate a proscription of divestiture.

We derive support for our analysis from *NBO Industries Treadways Companies, Inc. v. Brunswick Corp.,* 523 F.2d 262 (3d Cir.1975). There, the Third Circuit stated that while it was possible that members of the House committee assumed that § 16 did not create a private divestiture remedy, it doubted whether comments made during 1914 committee hearings should "control the contemporary application of a statute laying down a fundamental national economic policy." Rather, the court held

---

25. Our belief that Representative Floyd's comments cannot be taken as stating a Judiciary Committee intention regarding the scope of § 16 is supported by an exchange between Representative Floyd and a later witness. Floyd stated during the hearings on February 27, 1914, in reference to another proposed section "the purpose of these provisions as tentatively drafted...." The next witness that day then begins his comments by referring to that clarification and stating, "but as that point has been disposed of by the committee, ... it is unnecessary to discuss that phase." Representative Floyd responded: "I think it has not been disposed of, Mr. Harlan. There are 21 members of this Committee, and matters are not so easily disposed of. I simply made an explanation as one member of the subcommittee that had prepared the bill, as to my view of it. I would be very glad ... if you would state your views...." House Hearings at 1049–53.

[t]he antitrust laws are of necessity statements of general principle. They must be given meaning on a case-by-case basis. It is impossible for a legislature to devise codes so all-encompassing as to predict every case to which the general principles should apply. So, too, with antitrust remedies. There is a danger in permitting the pronouncements of statesmen long deceased to control the contemporary meaning of statutes which are almost an economic constitution for our complex national economy.

*NBO Industries*, 523 F.2d at 278–79. This is especially so where the statements on which reliance is to be grounded lack indicia of reliability and authority, as do these remarks made near the inception of committee hearings, the import of which is controverted by other comments and materials. While the Third Circuit concluded that a rule of general application was not required in its case because less drastic remedies would adequately redress the violations, the court hypothesized that divestiture might be an appropriate injunctive remedy where the effect of a merger of two competitors would be to lessen competition. *Id.* at 279; *see also id.* at 278 n. 17 (collecting cases on the availability of divestiture under § 16). Similarly, in *Fuchs Sugar and Syrups, Inc. v. Amstar Corp.*, 402 F.Supp. 636 (S.D.N.Y.1975), Judge Ward refused to grant a motion to dismiss on the grounds that divestiture was not available to a private plaintiff, and suggested that "[b]elaboring inconclusive scraps of legislative history may be less worthwhile than examining the broad aim of the statutory scheme." *Id.* at 639. The court concluded that divestiture is a potential remedy for private parties suing under the Clayton Act.

We draw additional support for our position from the comments of Professors Areeda and Turner. In commenting on the Ninth Circuit's *I.T.T.* opinion, these scholars stated:

> The court also gave decisive weight to a colloquy in the course of hearings in a House committee on the Clayton Act in which a congressman asserted a distinction between dissolution on the one hand and injunctions on the other. *That fragment of legislative history cannot bear the weight the court placed upon it, when the reports of the relevant House and Senate committees were silent on the point, which also did not appear to have been mentioned on the House or Senate floor.* Indeed, the court recognized that its conclusion deprived it of the natural and perhaps only effective remedy in the case before it. To hold a merger unlawful in a private suit while refusing to decree the undoing of that merger makes little sense in terms of antitrust policy.
>
> Fortunately, other courts have indicated, correctly, that divestiture is available in a private suit challenging unlawful mergers. The existence of power to order divestiture is distinct from the appropriateness of decreeing it in a particular case. Nevertheless, *divestiture is the normal and usual remedy against an unlawful merger, whether sued by the government or by a private plaintiff.*

II P. Areeda & D. Turner, Antitrust Law § 328b (1978) (footnotes omitted; emphasis added).

In conclusion, the Ninth Circuit's interpretation of the legislative history, on which the defendant relies, can be stated as follows. In 1914, there was such a clearly demarked and uniformly understood division between the equitable remedies of dissolution and injunction that it must be found that by authorizing "injunctive relief" but not other equitable remedies, Congress [26] expressly and intentionally exclud-

---

**26.** The Ninth Circuit explicitly holds this to be the House Judiciary Committee's view, and states that "[w]hether Congress shared this intention is not subject to rigorous proof." *I.T.T.*, 518 F.2d at 922. But the opinion treats its view of the Committee's understanding *cum* intention as that of Congress, *viz.,* asking "[w]hether by refusing to allow private 'dissolution' suits, Congress also refused to allow private 'divestiture' suits." *Id.*

**428**

ed the latter from the purview of § 16. We summarize our response as follows.

 First, a court possesses inherent powers of equity˘ regardless of whether equitable remedies are expressly authorized under the statute. *Romero-Barcelo,* 456 U.S. at 313, 102 S.Ct. at 1803; *Doe v. Brookline,* 722 F.2d 910, 917–18 (1st Cir. 1983). To hold Congress to have restricted these powers, a "clear and valid legislative command" must be identified. *Id.; Romero-Barcelo* 456 U.S. at 313, 102 S.Ct. at 1803. We do not believe that a technical distinction between two equitable remedies arguably current in 1914 rises to the level of a congressional command to restrict the court's inherent powers to secure "complete justice."

Second, we do not agree that "dissolution" and "injunctive relief" had unequivocal, or even generally agreed upon, definitions sufficient to conclude that injunctive relief was separate and distinct from dissolution. Indeed, the Supreme Court of that period, as now, appeared to view injunctions as one mechanism for bringing about a dissolution. *See American Tobacco Co.,* 221 U.S. at 186, 188, 31 S.Ct. at 650, 651. Moreover, at that time traditional equitable remedies were being refashioned to combat antitrust violations and labor strikes, *see* O.

Fiss, The Civil Rights Injunction 1–4, 10, 20–21 (1978), and thus, in this transitional period during which the law was grappling with the changes wrought by the accelerating industrialization of the nation, it is doubtful that a sharp distinction between the remolded dissolution remedy, and injunctive relief, was understood and intended by the Congress.

Third, unlike the Ninth Circuit, we do not believe that the term "injunctive relief" can be limited to what a court surmises was the meaning of the words at the time of the original statutory enactment.[27] The Clayton Act is a living statute; the current legal meaning and scope of its words cannot be ignored.

 Although we have no way of definitively determining the congressional intent in passing § 16, there remains at least one secure guidepost: when Congress uses broad generalized language in a remedial statute, and that language is not contravened by authoritative legislative history, a court should interpret the provision generously so as to effectuate the important congressional goals.[28] This principle has been understood and endorsed repeatedly both by the federal judiciary, *see, e.g., Gomez v. Toledo,* 446 U.S. at 639, 100 S.Ct. at

---

**27.** The problems inherent in that approach to statutory construction have been elaborated by Professor Brest:

> [such an interpreter] must determine what the adopters intended future interpreters to make of their substantive views. Even if she can learn how the adopters intended contemporary interpreters to construe the [statute], she cannot assume they intended the same canons to apply one or two hundred years later. Perhaps they wanted to bind the future as closely as possible to their own notions. Perhaps they intended a particular provision to be interpreted with increasing breadth as time went on. Or—more likely than not—the adopters may have had no intentions at all concerning these matters.

Brest, *The Misconceived Quest for the Original Understanding,* 60 B.U.L.Rev. at 220 (footnotes omitted). Although Professor Brest's comments were directed to constitutional interpretation, they are equally appropriate here. *See Appalachian Coals, Inc. v. United States,* 288 U.S. 344, 351, 359–60, 53 S.Ct. 471, 473–74, 77 L.Ed. 825 (1933) ("as a charter of freedom, the [Sherman

Act] has a generality and adaptability comparable to that found to be desirable in constitutional provisions"); *NBO Industries v. Brunswick Corp.,* 523 F.2d 262, 298 (3d Cir.1975) (antitrust laws are almost an "economic constitution" for this nation), *rev'd on other grounds sub nom. Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

**28.** *See also Leh v. General Petroleum Corp.,* 382 U.S. 54, 59, 86 S.Ct. 203, 207, 15 L.Ed.2d 134 (1965) ("effect must be given to the broad terms of the statute itself ... read in the light of Congress' belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws"); *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.) ("it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning"), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

1923 (1980); *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); *Doe v. Brookline,* 722 F.2d at 919; *McComb v. Super-A Fertilizer Works,* 165 F.2d 824, 826 (1st Cir. 1948), and Congress, *see, e.g., supra* note 8, and it is therefore an especially reliable and legitimate canon of construction. The attempt to restrict "injunctive relief" to its putative meaning in 1914 collides head-on with this principle and must be rejected.

Our reliance on this principle of statutory construction here is especially appropriate because the Sherman and Clayton Acts were drafted in broad terms to defeat an evil that Congress knew could take many forms. The explanations of record offered by committee and conference members were equally broad and general, stressing the purpose for which the section had been drafted. On the floor of neither the Senate nor the House, nor in any committee report, is there a single reference to any limitations or restrictions on § 16 "injunctive relief" which would negate the plain language or the sponsors' broad explanations of the provision. Accordingly, we decline to engraft judicially a *per se* limitation on § 16 forbidding an order for divestiture.

### D. *"Doing Equity" and Implementing the Goals of the Statute*

Section 16 requires that injunctive relief for private plaintiffs be dispensed "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity...." 15 U.S.C. § 26. In an important private action requesting injunctive relief, the Court clarified the important role of § 16:

> [T]he purpose of giving private parties treble-damages and injunctive relief was not merely to provide private relief but was to serve as well the high purpose of enforcing the antitrust laws.... Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords [injunctive relief], like other equitable remedies,

is flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as between competing private claims." ... Its availability should be "conditioned by the necessities of the public interest which Congress sought to protect."

*Zenith Radio Corp. v. Hazeltine,* 395 U.S. at 130–31, 1580–81.

An order to divest stock or assets acquired in effecting a combination is one of the most effective kinds of remedies available to combat mergers that have, or threaten to have, anticompetitive consequences. *See, e.g., United States v. du Pont & Co.,* 366 U.S. at 326, 81 S.Ct. at 1250; *I.T.T.,* 518 F.2d at 925. As the Supreme Court has observed:

> Divestiture is the most important of the antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of the court's mind when a violation of § 7 has been found.

*United States v. du Pont & Co.,* 353 U.S. at 597, 77 S.Ct. at 879. *See also United States v. Greater Buffalo Press,* 402 U.S. 549, 556, 91 S.Ct. 1692, 1697, 29 L.Ed.2d 170 (1971) ("Divestiture performs several functions, the foremost being the liquidation of the illegally acquired market power"). Although the Court was speaking of divestiture in the context of a suit brought by the government, we apprehend no reasons why the efficacy of divestiture as a remedy would not hold as well in § 16 cases. Because we are concerned with "doing equity," efficacy concerns are relevant; the goal is to *"secur[e] complete* justice." *Brown v. Swann,* 10 Pet. at 503.

Under the Clayton Act, courts have always possessed the power to prohibit a merger through a preliminary injunction. It is a logical extension of that power to divorce the partners to a merger at a later time when anticompetitive effects of the merger are, if not actually felt, considerably more imminent. Caribe here initially requested a preliminary injunction to prohibit the merger and backed that up with a petition for divestiture of the acquired com-

pany if it failed to achieve interlocutory relief. We cannot understand the logic of allowing a plaintiff, on the one hand, to obtain a congressionally intended result—the prohibition of an anticompetitive merger—on a showing that there will likely be market deterioration; but, on the other hand, if it fails to make the preliminary showing yet actually *proves* at trial that a merger is anticompetitive, obtain perhaps far less in that the same relief is barred.

Moreover, it is contrary to equitable principles to permit some defendants to maintain an illegal market share merely because they were able to merge before any of their competitors could prevent it. This places a premium on gamesmanship and stealth, and allows anticompetitive mergers to be treated differently on the basis of the speed and skill with which the merger is consummated. Unfortunately, the public is also the loser under such an approach as it cannot bring its own suit except through the Justice Department and must rely on the adventitious suits of private plaintiffs to maintain competitive conditions. We can conceive of no valid reason for allowing the presence or absence of proof at an interlocutory stage in and of itself to determine whether the private enforcement of antitrust laws prohibiting anticompetitive mergers will be deprived of one of its most effective remedies. *See* Dexter & Peacock, *Private Divestiture Suits Under Section 16 of the Clayton Act,* 48 Tex.L.Rev. at 55.

Any determination regarding whether divestiture would be an appropriate remedy in this case is, of course, premature and we venture no suggestion regarding what remedy the trial court should order if Caribe prevails. A range of injunctive relief is possible and, like all equitable remedies, the relief ordered is highly dependent upon the proof adduced at trial. We note only that "[t]he key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition." *United States v. du Pont & Co.,* 366 U.S. at 326, 81 S.Ct. at 1250. We do not direct or constrain the district court's sound discretion as to how the public and private interests in effective enforcement

of the antitrust laws can best be effectuated and refer the trial court both to traditional equitable principles and to those cases where the Supreme Court has applied those principles in an antitrust context.

*Reversed and remanded.*

Since the district court originally adopted so strong a position against the availability of the divestiture remedy, we think that this is a case where it would be easier all around, including for the judge himself (without any reflection on him), to have the case reassigned to a different trier. Costs to appellants.