Ephraim ISAAC, Plaintiff, Appellant,

v.

HARVARD UNIVERSITY,
Defendant, Appellee.

No. 84-1934.

United States Court of Appeals,
First Circuit.

Heard May 8, 1985.

Decided July 26, 1985.

Edward Greer, Cambridge, Mass., for plaintiff, appellant.

Barbara Lipsky, Washington, D.C., with whom Johnny J. Butler, Acting Gen. Counsel, and Vincent Blackwood, Asst. Gen. Counsel, Washington, D.C., were on brief for E.E.O.C., amicus curiae.

Jane G. Rocamora, Oakland City, Ind., on brief for Nat. Council for Black Studies, Inc., amicus curiae.

Richard P. Ward, Boston, Mass., with whom Ropes & Gray, Boston, Mass. and Robert B. Donin, Cambridge, Mass., Office of the Gen. Counsel, Harvard University, were on brief for appellee.

Before COFFIN and TORRUELLA, Circuit Judges, and WYZANSKI,* Senior District Judge.

COFFIN, Circuit Judge.

Appellant Ephraim Isaac filed a charge of employment discrimination against appellee Harvard University under Title VII of the Civil Rights Act of 1964 (Title VII). The district court, 603 F.Supp. 22, interpreted section 706 of Title VII in such a way as to find that Isaac's charge was filed with the Equal Employment Opportunity Commission (EEOC) after the statutory deadline of 300 days, and it granted defendant's motion for summary judgment. Appellant challenges the district court's construction of the statute and seeks reversal of the summary judgment. He also appeals the district court's denial of a discovery motion and refusal to allow him to amend his complaint. We affirm the refusal of the proffered amendment, but reverse the summary judgment ruling and remand for further consideration of the discovery motion.

## I. LEGAL AND FACTUAL BACKGROUND

■ The main issue in this case is one of statutory construction. Accordingly, we begin with a brief look at the federal statutory framework that governs the filing of employment discrimination complaints. In states which have their own statutes similar to Title VII, such as Massachusetts,

---

* Of the District of Massachusetts, sitting by designation.

Title VII requires that a complaint be filed with the EEOC within 300 days after the alleged discriminatory act. Section 706(e), 42 U.S.C. § 2000e–5(e). Title VII also requires that the claim be considered by the state employment discrimination agency before it can be filed with the EEOC. Section 706(c), 42 U.S.C. § 2000e–5(c). To help claimants comply with this "deferral" requirement, the EEOC will transmit to the state agency any claim which it receives from individuals who did not first file under state law, which is what occurred in this case. *See Love v. Pullman,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). The claim with the EEOC is held in "suspended animation", *id.* at 526, 92 S.Ct. at 618, until after the period of deferral specified by section 706(c), and then it is automatically deemed filed with the federal agency. Under section 706(c)'s deferral provision, this automatic filing may not occur until either state proceedings have been terminated or 60 days have passed since the filing with the state agency. Taken together, the deferral and deadline provisions of Title VII mean, first, that a charge filed with a state agency by the 240th day after an alleged violation always will be timely under federal law because the 60-day deferral period will run within the 300-day limitation period, and second, that a charge submitted after the 240th day will be timely only if the state "terminates" its proceedings by the 300th day.

On June 27, 1975, Isaac was told that he had not been recommended for tenure in the Afro-American Studies Department at Harvard. He filed his charge of discrimination with the EEOC on February 23, 1976, 241 days later. On March 4, 1976, the 251st day since the alleged discriminatory act, the EEOC sent a copy of Isaac's charge to the Massachusetts Commission Against Discrimination (MCAD) so that it could review the claim first, pursuant to section 706(c)'s deferral requirement. On March 16, Day 263, the EEOC received from the MCAD a form stating that the MCAD would not process the charge. The EEOC then began its own proceedings and, on February 23, 1979, made a finding of "reasonable cause" on behalf of Isaac.[1] Subsequent attempts at conciliation failed and the EEOC gave Isaac a notice of right to sue on March 26, 1980.[2] He filed suit on June 24, 1980.

After some preliminary activity in the lawsuit, Harvard moved for summary judgment on the ground that Isaac's filing with the EEOC was untimely. The district court denied the motion, finding that the Massachusetts proceedings had terminated on March 16, 1976, when the MCAD told the EEOC it would not process the charge, and that Isaac's official filing with the EEOC had therefore occurred on Day 263 after he first learned of the tenure denial. On reconsideration, however, the court granted Harvard's motion for summary judgment. It based its new ruling on documents submitted by Harvard showing that the MCAD had not reached a *final* disposition of Isaac's case on March 16, 1976. In particular, Harvard demonstrated that on March 7, 1979, two weeks after the EEOC had found "reasonable cause", the MCAD had issued its own finding of "probable cause". Much later, on June 28, 1984, the MCAD had written to Isaac asking about the status of his case. Isaac's lawyer had responded by asking that his file remain open and requesting that a public hearing be scheduled. In a reply, the MCAD had denied the requested hearing, explaining that it routinely suspends its proceedings in cases in which a complainant has filed a federal suit. The MCAD had emphasized, however, that the case was not closed and that Isaac could renew

---

1. The Commission found "reasonable cause to believe that Respondent has engaged in unlawful practices in violation of Title VII of the Civil Rights Act of 1964, as amended, by denying tenure to Charging Party, as alleged, because of his race (Black) and national origin (Ethiopian)."

2. Once reasonable cause is found, the Commission begins conciliation efforts. If no agreement between the parties is reached, the Commission or the complainant may file a suit in federal court. Section 706(f)(1), 42 U.S.C. § 2000e–5(f)(1).

his request for a hearing at the conclusion of his federal court case.

This exchange of correspondence convinced the district court that state proceedings had not been "terminated" under section 706(c) and that the EEOC complaint could not be deemed filed until 60 days after the MCAD had received Isaac's complaint. That meant that Isaac's complaint with the EEOC was not filed until the 311th day after the alleged discriminatory act, too late under section 706(e). For that reason, the court granted Harvard's motion for summary judgment and dismissed Isaac's complaint on the merits.[3]

## II. THE TIMELINESS ISSUE

Everyone in this case agrees that Isaac's EEOC complaint was untimely unless the MCAD proceedings were "terminated" within 300 days after he learned that he had been denied tenure. Isaac argues that the MCAD's act of referring the complaint back to the EEOC constituted "termination" under section 706(c), and he is supported by the EEOC, which filed an amicus brief on his behalf. Harvard contends that nothing short of total relinquishment of the case fulfills the statutory requirement.

A preliminary principle of statutory construction which the United States Supreme Court has endorsed repeatedly in recent cases is that a court may look beyond statutory language that is unambiguous only in "extraordinary" circumstances, *Garcia*

v. United States, — U.S. —, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984); *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983); *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). *See In re Smith & Wesson*, 757 F.2d 431, 434–35 (1st Cir.1985); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 415 (1st Cir.1985). We have concluded that we need not apply this difficult standard because we find the words of section 706(c) to be ambiguous.[4]

Section 706(c) states in relevant part: "[N]o [federal] charge may be filed ... before the expiration of sixty days after [state] proceedings have been commenced ... unless such proceedings have been earlier terminated...." In finding ambiguity, we deal with the two key words, "terminated", and "proceedings". We observe preliminarily that the former is not a term of art which radiates the accretions of legislative or judicial interpretation, and that the latter may indeed be a precisely defined term of art in a specific statute—or it may not. The first meaning of "terminate" listed in Webster's Third New International Dictionary is "to bring to an ending or *cessation in* time, sequence, or *continuity* ..." (emphasis added). Harvard argues, in effect, that the argument as to meaning comes to an end if one acknowledges that "terminate" means "come to an end". But, as the references in the foregoing definition to "time, sequence, or continuity" sug-

---

3. We present the facts related to Isaac's other two claims as part of our discussion of those issues below.

4. Even were we to find the words of section 706(c) to be "plain" and "unambiguous", we believe that this *would* be a proper case for going beyond the statutory language. "[T]he plain meaning rule is rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.' *Boston Sand Co. v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.)." *Watt v. Alaska*, 451 U.S. 259, 265–66, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981). Such evidence does exist in this case, and it convinces us that the meaning of 42 U.S.C. § 2000e–5(c) is not that which Harvard ascribes to it. *See infra* pps. 822–823. *See also Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41

L.Ed.2d 374 (1974) ("When 'interpreting a statute, the court will ... take in connection with it ... the objects and policy of the law ... and give to it such a construction as will carry into execution the will of the Legislature.'"); *United States v. American Trucking Ass'ns.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'"); *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (same, quoting *American Trucking*). *See also In re Smith & Wesson*, 757 F.2d at 435; *Cia. Petrolera Caribe*, 754 F.2d at 415.

gest, there is often a time element qualifying an "end".[5] We speak of ending negotiations despite the likely inevitability of their resumption, of terminating work on the job-site knowing that it will resume the next day, or of concluding the day's trial proceedings realizing that new witnesses will be on the stand in the morning.

When we consider the dictionary definition together with the language of the statute as a whole, we find ourselves in agreement with the EEOC that it does not strain normal English usage to equate "terminated" in this context with "halted" or "stopped". The statute plainly allows the EEOC to proceed in 60 days no matter what the state agency has done, so there is no rigid requirement that the state complete all of its business before the EEOC can act. "Terminated" in section 706(c) could, therefore, mean a *temporary* cessation, or an ending of a defined segment of action.

This possible meaning of a temporary, or narrowly defined cessation of action, is reinforced when we consider the term "proceeding". The Supreme Court has found that in various sections of Title VII, "the word 'proceeding,' or its plural form, is used to refer to all the different types of proceedings in which the statute is enforced, state and federal, administrative and judicial", *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 62–63, 100 S.Ct. 2024, 2030, 64 L.Ed.2d 723 (1980). The Court has also further acknowledged that it is unlikely that "proceedings" in section 706(c) includes *judicial* proceedings as distinct from administrative proceedings. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 471 n. 8, 102 S.Ct. 1883, 1892 n. 8, 72 L.Ed.2d 262 (1982). Thus, the Court has suggested that the meaning of "proceedings" depends upon its statutory context. In the context of section 706(c), we think it is possible that "proceedings" not only is limited to administrative proceedings but also is limited to the first stage of those proceedings. It is plausible that Congress intended nothing more than to hold up federal action until completion of the initial proceedings directly triggered by a complaint. Only if the state agency did not actually terminate its review of a claim, but immediately continued the proceedings into other stages, would the claimant have to wait up to 60 days before filing with the EEOC.[6]

---

**5.** Harvard quarrels with the choice of this definition from Webster's, and urges that we adopt one from Black's Law Dictionary (5th ed. 1979). The definition in Black's, however, also includes time as a component. It defines "termination" as "end in time or existence; close; cessation; conclusion".

**6.** Harvard points to two other sections of Title VII in urging that Congress could have intended "terminated" in section 706(c) only to mean a relinquishment of all action. First, in section 718, 42 U.S.C. § 2000e–17, Congress provided that "[n]o Government contract ... shall be denied, withheld, terminated, or suspended" except under certain conditions. Harvard argues that the separate use of "terminated" and "suspended" in that context demonstrates that "terminated" could not mean "suspended" in section 706(c). The use of "proceedings" and "terminated" in section 706(c) are interrelated, however, and Harvard's argument fails if the proceedings at issue could be only the "initial proceedings." Second, in section 709(b), 42 U.S.C. § 2000e–8(b), Congress wrote that the EEOC could enter into cooperative agreements with state and local agencies and "refrain from processing a charge" in certain cases. Harvard suggests that if Congress had intended state waiver of initial processing to shorten the 60-day deferral period, it could have written section 706(c) so that EEOC filing also would have been triggered if the state or local agency "refrained from processing the charge." In a sense, Congress did include a "refrain from" provision in the form of the 60-day deferral period. That is how long the state agency would be able to do nothing, as well as how long it would have for active processing without federal involvement. The "termination" part of section 706(c) could have been viewed as the *affirmative* decision not to go forward with a charge, even temporarily.

Moreover, in making its comparison of language, Harvard ignores two important points. First, section 706(c) received specific and prolonged attention from a bipartisan committee which drafted a substitute for the House civil rights bill. *See infra* at pps. 822–23. Second, section 718 was added to Title VII in 1972. 42 U.S.C. § 2000e–17 (U.S.C.A.1981). We are unpersuaded that the meaning of section 706(c) can be established through comparison with sections of Title VII which survived the Senate process with little change, *compare* 110 Cong.

We therefore conclude that "terminated" and "proceedings", each capable of bearing an interpretation of some cessation short of an ultimate and final disposition, are ambiguous. "[T]here is no errorless test for identifying or recognizing 'plain' or 'unambiguous' language", *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981), and we would hesitate to erect in front of a Title VII claimant a barrier of words whose foundation is even slightly shaky. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 397, 102 S.Ct. 1127, 1134, 71 L.Ed.2d 234 (1982) ("In *Love v. Pullman Co.*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), we announced a guiding principle for construing the provisions of Title VII. Declining to read literally another filing provision of Title VII, we explained that a technical reading would be 'particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.' ") We thus turn to the factors which inform our interpretation of the statute.

### 1. *Legislative History*

Section 706(c) of Title VII of the Civil Rights Act of 1964 is, happily, not one of those minor subsections of legislation which trigger the thorniest problems of statutory construction because they survived debate unnoticed and without comment by the Members of Congress. The issue reflected in section 706(c), the relationship between federal and state remedies for employment discrimination, received much attention throughout the legislative process. *See, e.g.,* 110 Cong.Rec. 2541–42; 2788–89; 6449–50; 7205; 7214; 7216; 8193; 12595; 12721; 12724–25; 13087 (1964). At the end of lengthy debate over the Civil Rights bill in the Senate, Senator Humphrey explained that one of "two guiding objectives" for Senate revi-

sions in the House bill was "substantive changes which provided ample opportunity for State action, yet preserved the ultimate authority of the Federal Government to protect the civil rights of the citizens of this country", 110 Cong.Rec. 12725.

Among the many references in the legislative history to the issue of federal-state interaction, and the ones most pertinent to our discussion, are those explaining the Senate version of the "deferral" provision which was to become section 706(c). Senator Humphrey summed up the Senate proposal as intended to guarantee that States with "functioning antidiscrimination programs …

> will be given every opportunity to employ their expertise and experience without premature interference by the Federal Government…."

> "At the same time, we recognized the absolute necessity of providing the Federal Government with authority to act in instances where States and localities did not choose to exercise these opportunities to solve the problem of civil rights in a voluntary and localized manner…." *Id.* at 12725.

Indicative of other comments were those of Senator Dirksen, who had been outspoken on the potential conflict between state and federal remedies and who, along with Senator Humphrey, helped draft the Senate substitute for the House bill. He stated that "we undertook to keep primary, exclusive jurisdiction in the hands of the State commissions *for a sufficient period of time* to let them work out their own problems at the local level", *id.* at 13087 (emphasis added), and earlier had provided an explanation of Senate changes in the bill which noted that the statute gave state or local authorities exclusive jurisdiction *"for a limited period of time"*, *id.* at 12819 (emphasis added).[7] *See also* 110 Cong.Rec. 12725,

---

Rec. 2512 (1964), sections 708(b) and 709(b), *with* 42 U.S.C. § 2000e–8(b), or which were not drafted until a later amendment process.

**7.** Harvard quotes a passage of the Senate debate in which Senator Dirksen expresses concern about the "layering upon layer of enforcement",

110 Cong.Rec. 6449–6450. His concern, however, seemed addressed more toward the problem of multiple *lawsuits* against the same defendant than it did about the prospect of overlapping state and federal *agency* jurisdiction. *See Kremer v. Chemical Construction Co.*, 456

14331; *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 755, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (section 706(c) is "intended to give state agencies *a limited opportunity* to resolve problems of employment discrimination and thereby to make unnecessary, resort to federal relief by victims of the discrimination") (emphasis added); *New York Gaslight*, 447 U.S. at 63, 100 S.Ct. at 2030 (1980). *Cf.* 110 Cong. Rec. 12595 (Senator Clark expressed concern that deferral would, in effect, deny some individuals relief because "justice delayed is justice denied").[8]

■■■ With this history as our guide, we cannot help but conclude that Congress did not intend section 706(c) to bar EEOC jurisdiction once a state has waived its exclusive claim to a case. The legislative history is full of references to the "limited" nature of the federal deferral; Congress wanted only to keep the federal agency from usurping the state's role in the employment discrimination field. Once a state seeks federal involvement, however, there is no need for deferral.

Harvard, though, argues that deferral is only part of what Congress had in mind. It points out that meeting the requirements of section 706(c) opens up access to the federal courts, and it contends that Congress did not intend federal jurisdiction when the state agency has only suspended action because that, too often, would result in duplicative proceedings. Harvard foresees complainants regularly filing claims with the state agency more than 240 days after the alleged violations. If they could secure a waiver of state processing in order to file with the EEOC within 300 days, the complainants could first obtain EEOC processing and then have "a second bite at the apple" by activating their state claims.

We agree that the process Harvard describes can happen, and can be duplicative. We do not agree, however, that it is inconsistent with the legislative history of Title VII. In fact, the legislative history suggests that double coverage was exactly what Congress had in mind to ensure vindication of federal civil rights. Congress did not limit jurisdiction to those cases in which the state remedy turned out to be inadequate. Even when the state agency has reached a final decision on the merits in favor of a claimant, he is entitled to reopen the matter with the EEOC to seek a "better" remedy. Moreover, section 706(c) is not an exhaustion statute; it specifically envisions concurrent EEOC processing if state proceedings continue beyond 60 days. And, finally, any duplication is limited to the agency proceedings, since the doctrine of *res judicata* would preclude a second court judgment. *Kremer v. Chemical Construction Co.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).[9] Although

---

U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (under the principles of res judicata, a defendant in an employment discrimination case would face only one judgment).

**8.** Although the Supreme Court has described the federal procedures as designed "to screen from the federal courts those problems of civil rights that could be settled to the satisfaction of the grievant in 'a voluntary and localized manner' ", *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 755, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979), and solely as "supplements" to the local remedies, *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 65, 100 S.Ct. 2024, 2031, 64 L.Ed.2d 723 (1980), it has not suggested that the purpose of the section was other than to assure state and local agencies the first chance to solve their discrimination problems. *See Oscar Mayer*, 441 U.S. at 761 and 761 n. 8, 99 S.Ct. at 2074 and 2074 n. 8 (construing § 14(b) of the Age Discrimination in Employment Act, 29 U.S.C.

§ 726(c), which contains the same language, policy and legislative history as § 2000e–5(c)).

**9.** The Supreme Court has strongly implied that duplication is not the harm Conngress intended to avoid with section 706(c). In *Oscar Mayer*, 441 U.S. 750, 99 S.Ct. 2066, 60 L.Ed.2d 609, it interpreted section 14(b) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633(b), the equivalent of section 706(c), as requiring resort to state proceedings even though the ADEA statute allows simultaneous filing with the state and federal agencies, in contrast to section 706(c)'s 60-day deferral requirement. The Court's holding means that the state and federal agencies may begin investigations at the same time. Rather than expressing any concern about this duplication, the Court indicated that the double dose of attention "may well facilitate settlements", *id.* at 757, 99 S.Ct. at 2072. The Court's implicit message appears to

legislators discussed potential Federal savings in areas where state laws were effective, 110 Cong.Rec. 7205, and expressed hope that claims could be resolved at the local level, *see* remarks of Senator Dirksen, 110 Cong.Rec. 13087, section 706(c) was first, and foremost, a statute of deference. Thus, once a state agency declines the full sixty days of deferral, the legislative history suggests that section 706(c) no longer has a purpose.[10]

### 2. *Isaac's Case*

■ The facts of Isaac's case show the common sense of interpreting section 706(c) to mean that a state agency has "terminated" its "proceedings" when it acts as the MCAD has done in this case. The EEOC transmitted Isaac's charge of employment discrimination to the MCAD along with a form labeled "Notice of Deferral Transmittal". The form read, in pertinent part:

"This charge is being deferred to your agency pursuant to Section 706(c) of Title VII of the Civil Rights Act of 1964, as amended. The Commission will automatically file this charge at the expiration of the deferral period, unless we are notified before the expiration of that period

that your agency has terminated its proceedings....

"Please complete and return the bottom portion of this form to advise us whether you intend to process the charge. If you accept it for processing, the EEOC will refrain from processing until a final disposition is made by your agency."

The bottom portion of the form begins with a statement acknowledging receipt of the discrimination complaint. It then contains the words "This agency" and gives two choices to the state agency: "Will process this charge. Please refrain from processing until we have reached a final disposition", and "Will not process this charge because _____." The MCAD marked off "Will not process this charge" and filled in the blank with "per agreement [with] EEOC".

The agreement referred to is known as a "worksharing agreement", a method of cooperation which has evolved as the practical solution to the concurrent jurisdiction given by Title VII. These agreements divide up responsibilities for the processing of charges of discrimination between the state agency and the EEOC to avoid duplication of effort. *See* EEOC Procedural Regulations, 29 C.F.R. § 1601.13(c).[11] Al-

---

be that deference, and not duplication, was at the heart of section 706(c).

**10.** Congress met the concern over duplicative proceedings in other sections of Title VII. It authorized the EEOC to agree to refrain from processing certain cases, 42 U.S.C. § 2000e-8(b), and, in this case, the EEOC would have awaited the outcome of state proceedings had the MCAD requested that it do so. *See* the deferral form quoted in the text. Congress also gave federal courts the discretion to stay proceedings for 60 days pending the outcome of state actions, 42 U.S.C. § 2000e-5(f)(1).

**11.** These agreements are authorized by section 705(g)(1), 42 U.S.C. § 2000e-4(g)(1), which empowers the EEOC "to cooperate with and, with their consent, utilize regional, State, local, and other agencies", and by section 709(b), 42 U.S.C. § 2000e-8(b), which provides:

"The Commission may cooperate with State and local agencies charged with the administration of State fair employment practices laws and, with the consent of such agencies, may, for the purpose of carrying out its functions and duties under this subchapter and

within the limitation of funds appropriated specifically for such purpose, engage in and contribute to the cost of research and other projects of mutual interest undertaken by such agencies, and utilize the services of such agencies and their employees, and, notwithstanding any other provision of law, pay by advance or reimbursement such agencies and their employees for services rendered to assist the Commission in carrying out this subchapter. In furtherance of such cooperative efforts, the Commission may enter into written agreements with such State or local agencies and such agreements may include provisions under which the Commission shall refrain from processing a charge in any case or class or cases specified in such agreements...."

The agreements may specify that each agency will process the charges first filed with it, *see* 1984 worksharing agreement between the MCAD and the EEOC and *Thompson v. International Association of Machinists*, 580 F.Supp. 662 (D.D.C.1984); they may state that claims involving certain employers will be assigned to one of the agencies, *see* 1978 worksharing agreement between the MCAD and the EEOC; or they may allocate the work in a variety of other ways, *see*

though the 1975 worksharing agreement between the EEOC and the MCAD is unavailable, the record does include two later agreements between the two agencies, and under both of them, the MCAD would have waived its right to initial processing of Isaac's claim. Under the 1978 agreement, the EEOC handled complaints against Harvard University. Under the 1984 agreement, the EEOC would have processed Isaac's claim because he filed first with the federal agency.

After the MCAD returned the bottom half of the form to the EEOC, the MCAD proceedings came to a halt in accordance with the worksharing agreement, and the state agency took no further action until it issued its finding of "probable cause" three years later, relying substantially on the EEOC's similar finding. In light of the legislative history's emphasis on the temporary nature of the federal deferral, it seems only sensible to find that when a state agency acts in this manner—suspending the processing of a claim and looking to the EEOC for further action—the state agency has "terminated" its "proceedings" within the meaning of section 706(c).

Two aspects of the events in this case are of particular importance to this conclusion. First, the state agency had stopped its proceedings specifically to allow the EEOC to proceed, in effect deferring back to the federal agency. And, second, to read the statute Harvard's way would deprive Isaac of a federal forum for a claim which was fully processed and investigated first and, so far, only by a federal agency. Under these circumstances, we believe it would frustrate the intent of Congress to hold that Isaac had failed to meet the jurisdictional requirements of section 706(c). *See Oscar Mayer,* 441 U.S. at 761 and 761 n. 8, 99 S.Ct. at 2074 and 2074 n. 8 ("Indi-

viduals should not be penalized if States decline, for whatever reason, to take advantage of [their] opportunities" for settling grievances so that claimants neither want nor need independent federal relief).[12]

Of course, one way to adopt Harvard's interpretation of section 706(c) so that it makes sense is to find that worksharing agreements like the one operating in this case are invalid and that the only way for a state agency to reduce the 60-day deferral period is to completely relinquish a case. Such a restriction would not necessarily undercut the Congressional goal of cooperation between state and local agencies because the state still could have access to the EEOC workproduct. The difference would be one of time only. The EEOC would have to wait out the 60-day deferral period before beginning its processing of a claim, and so the state agency would not receive the benefits of the federal efforts for that much longer. Although this time difference may not seem significant, such a delay would serve no purpose. And it would undermine another expressed goal of Title VII: "that aggrieved persons ... have their cases processed promptly", S.Rep. No. 415, 92nd Cong., 1st Sess. 24 (1971). *See also Mohasco Corp. v. Silver,* 447 U.S. 807, 825, 100 S.Ct. 2486, 2496, 65 L.Ed.2d 532 (1980) (by choosing short deadlines for filing Title VII complaints, "Congress clearly intended to encourage the prompt processing of all charges of employment discrimination"); *New York Gaslight,* 447 U.S. at 65, 100 S.Ct. at 2031; *Love v. Pullman,* 404 U.S. at 526, 92 S.Ct. at 618. Moreover, precluding worksharing agreements like the one which operated here would seem to detract from, rather than further, the states' rights approach Congress sought to implement. For example, a state which seeks to waive initial

---

1984 worksharing agreement between the MCAD and the EEOC.

Some agreements provide for a complete waiver of state jurisdiction in certain cases; in those cases, the state is indicating that it does not intend to process the charge at issue at all. *See, e.g., Barela v. United Nuclear Corp.,* 462 F.2d 149 (10th Cir.1972).

**12.** It would be different if all the MCAD had done in this case were to solicit help from the EEOC for a state investigation, perhaps borrowing a federal investigator to work with the state agency or using EEOC research materials. That is not what happened. The MCAD bounced the whole ball back to the EEOC.

processing because of inadequate finances or heavy workload would be unable to secure the quick attention to its citizens' claims offered by the worksharing agreements—that is, unless it were willing to "terminate" in Harvard's sense of the word and forfeit all right to consider the claim in the future.

### 3. *Miscellaneous*

Harvard also urges us to consider several other factors in interpreting section 706(c). It suggests that construing the statute so as to equate termination with suspension would conflict with the policy for interpreting Title VII filing requirements that was enunciated in *Mohasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532. There, the Court held that the date of filing with the EEOC is not the date the complaint is first submitted to the agency, but the date following the deferral period. *Id.* at 825, 100 S.Ct. at 2496. The appellant had argued that a charge is "filed" for purposes of section 706(e)'s 300-day time limit when received by the EEOC, although it could not be "filed" under section 706(c) until the state deferral period ended as many as 60 days later. *Id.* at 813, 100 S.Ct. at 2490. The Court refused this argument because it would require giving the word "filed" two different meanings within the same section of the statute and would directly conflict with section 706(e)'s 300-day deadline by extending the filing period to 360 days (initial filing on Day 300 with the 60 "deferral" days added thereafter). *Id.* at 825–26, 100 S.Ct. at 2496–97. The Court commented that it could not "simply interject an additional 60-day period into the procedural scheme. We must respect the compromise embodied in the words chosen by Congress. It is not our place simply to alter the balance struck by Congress in procedural statutes by favoring one side or the other in matters of statutory construction." *Id.* at 826, 100 S.Ct. at 2497.

We do not believe our decision conflicts with this policy and, in fact, we believe it accords the most respect to "the compromise embodied in the words chosen by Congress." Our interpretation serves the primary purpose of the statute—to give states the *chance* to go first in processing employment discrimination claims—while furthering the broad policy of Title VII to provide relief from such discrimination as quickly as possible. We believe the appropriate comparison for this case is not with *Mohasco*, but with *Love v. Pullman*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679, in which the Court ruled that a claimant need not physically resubmit a claim to the EEOC after the period of state deferral but that the claim would be deemed automatically filed at that time. Unlike *Mohasco*, this case does not involve extending a deadline specified by statute, but like *Love*, it simply involves a practical construction of a statute to serve the goals Congress intended without imposing unnecessary procedural formalities on Title VII claimants. In language which also applies to this case, the Court in *Love* observed:

> "The procedure complies with the purpose both of § 706(b), to give state agencies a prior opportunity to consider discrimination complaints, and of § 706(d), to ensure expedition in the filing and handling of those complaints." *Love v. Pullman*, 404 U.S. at 526 [92 S.Ct. at 618] (Title VII amendments changed section 706(b) to section 706(c) and section 706(d) to section 706(e)).

■ Harvard also points to EEOC regulations which specify three circumstances under which a charge may be deemed properly filed with the EEOC: after passage of 60 days, after termination of state proceedings, or "upon waiver of the [state agency's] right to exclusively process the charge...." 29 C.F.R. § 1601.-13(a)(5)(ii)(B). We do not view this language as showing that the word "terminate" as used in section 706(c) does not apply to a temporary suspension of proceedings. The EEOC adheres to the view that "termination" does include the type of waiver which occurred in this case. While an agency interpretation is not entitled to any special weight if it conflicts with the statutory language, *Mohasco*, 447 U.S. at

825, 100 S.Ct. at 2496, when there is reasonable doubt as to the statute's meaning, "the EEOC's interpretation of § 706(c) ... is 'entitled to great deference.' *Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 855, 28 L.Ed.2d 158 (1971)." *Oscar Mayer,* 441 U.S. at 761, 99 S.Ct. at 2074 (1979); *Chemical Manufacturers Ass'n, et. al. v. Natural Resources Defense Council, Inc.,* —— U.S. ——, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Silverman v. Rogers,* 437 F.2d 102, 107 (1st Cir.1970). *Cf. Donovan v. A. Amorello & Sons Inc.,* 761 F.2d 61, 63–65 (1st Cir.1985) (concerning interpretation of agency regulation). In light of the EEOC's construction of section 706(c), the regulation Harvard cites could well be an attempt to make specific what the statutory language leaves ambiguous.

Harvard makes another technical attack on Isaac's interpretation by raising Mass. Gen.Laws Ann. ch. 151B, § 9 (West 1982), which states in pertinent part:

"... but, as to acts declared unlawful by section four, the procedure provided in this chapter shall, while pending, be exclusive; ..."

The university's argument is that, as a matter of state law, the MCAD may not waive its exclusive jurisdiction to determine whether there has been unlawful discrimination. We doubt this provision is capable of bearing the meaning Harvard attributes to it. Our reading suggests that it addresses only an individual's ability to file separate Massachusetts claims, and does not speak to concurrent rights under federal law. Moreover, there is nothing to suggest that the MCAD is without power to waive exclusive jurisdiction in the appropriate case. Whatever the meaning, it would not affect our view that under section 706(c), a federal statute, the MCAD had "terminated" its "proceedings" when it took the steps it took in this case. Thus, even if the MCAD had violated state law when it waived exclusive jurisdiction over Isaac's claim, his status before the EEOC would be unaffected.

Finally, although we are the first circuit to address this issue, the "suspension" view of section 706(c)'s "termination" requirement has been endorsed by five of the six district courts which have expressly considered it, *Thompson v. International Ass'n of Machinists,* 580 F.Supp. 662 (D.D.C.1984); *Stiessberger v. Rockwell International Corp.,* 29 Fair Empl.Prac.Cas. (BNA) 1273 (E.D.Wash.1982); *Douglas v. Red Carpet Corp. of America,* 538 F.Supp. 1135 (E.D.Penn.1982); *Yeung v. Lockheed Missiles & Space Co., Inc.,* 504 F.Supp. 422 (N.D.Cal.1980); *Cattell v. Bob Frensley Ford, Inc.,* 505 F.Supp. 617 (M.D.Tenn. 1980). *See also Gunn v. Dow Chemical Co.,* 522 F.Supp. 1172 (S.D.Ind.1981) (a provision of workshare agreement triggered "termination" of state proceedings when state failed to take any action on complaint referred to it by EEOC). *Cf. Hochstadt v. Worcester Foundation, Etc.,* 545 F.2d 222, 225 n. 1 (1st Cir.1976) (plaintiff obtained waiver of jurisdiction from the MCAD, allowing EEOC to proceed; apparently complete waiver of jurisdiction); *Pacific Maritime Ass'n v. Quinn,* 465 F.2d 108 (9th Cir.1972) (perfunctory termination is sufficient to meet requirements of section 706(c)); *McKeever v. Atlantic Spring & Mfg. Co., Inc.,* 502 F.Supp. 684 (E.D.Pa. 1980) (plaintiff obtained waiver from state agency, apparently of all jurisdiction) ("the principal concern of § 2000e–5(c) is that state and local agencies not be deprived of their power to act by the federal government", and so " '[v]irtually anything that the state agency does of its own initiative in order to be rid of a case may be sufficient to pass jurisdiction on to the EEOC via § 2000e–5(c) ...' ", *id.* at 688 (quoting *Lombardi v. Margolis Wines & Spirits, Inc.,* 465 F.Supp. 99, 101 (E.D.Pa.1979)). *But see Klausner v. Southern Oil Co. of New York,* 533 F.Supp. 1335 (N.D.N.Y. 1982) (termination means complete relinquishment of the case).

For the foregoing reasons, we conclude that the MCAD's waiver of the right to initially process Isaac's charge constituted a "termination" of state proceedings for

the purposes of section 706(c), and that his EEOC complaint was timely filed.

## III. DISCOVERY ORDER

In response to Isaac's request that 32 categories of documents be produced at the deposition of Henry Rosovsky, dean of Harvard's Faculty of Arts and Sciences, Harvard filed a motion to quash Rosovsky's subpoena and for a protective order. The district court quashed the subpoena "because it appears at this time to be in violation of the criteria set forth in Fed.R. Civ.P. 26(b)(1), ¶ 2", and ordered Harvard to produce only a limited number of the requested documents.

Isaac argues that we should vacate this ruling, and direct the court to reconsider his document requests and any objections to them. He claims that the district court's order is improper at least because it fails to explain which aspect of Rule 26(b)(1) was implicated. Harvard counters that we should not review a discovery matter at all at this point in the proceedings because the district court did not close discovery and we therefore are unable to evaluate the issue fully.

■ We believe the order must be vacated. We are unable to determine on what ground under Rule 26 the district court quashed the subpoena, and therefore can not determine whether there was an abuse of discretion. It seems likely, for example, that at least some data in documents concerning other candidates considered for tenure at about the same time as Isaac could reveal differences in review procedures and that such information would be important to Isaac's case. See E. Bartholet, *Application of Title VII to Jobs in High Places*, 95 Harv.L.Rev. 947, 962 (1982). Yet the district court refused Isaac access to them, and we do not know if it did so because it found the request for those documents to be unduly burdensome, unreasonably cumulative, or deficient in some other way.

At the same time, however, the record makes clear that the district court intended to allow further discovery if the summary judgment were reversed. Thus, even if the court had provided explanation for its Rule 26 finding and, for instance, held that certain matters could be obtained more easily in other ways, we could not simply order production of the documents since we could not know yet whether Isaac *would* have other sources of information.

Thus, we think the best approach to this issue is to vacate the court's unexplained order and to remand the matter of discovery to the district court with instructions that it review anew Isaac's request for the documents previously denied, and that it explain its reasons for again denying any of them. In considering Isaac's requests, the district court should keep in mind the courts' responsibility "to provide a forum for the litigation of complaints of ... discrimination in institutions of higher learning as readily as for other Title VII suits", *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169, 176 (1st Cir.1978), *vacated on other grounds*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam), and it "must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case", Fed.R. Civ.P. 26(b) advisory committee notes to 1983 amendment.

## IV. AMENDMENT OF THE COMPLAINT

■ Isaac filed his original complaint on June 24, 1980. Nearly four years later, after a pretrial conference had been scheduled, he moved for leave to amend to add state law claims for fraud, breach of contract and violation of the Massachusetts Constitution. The district court denied the motion, apparently on the bases of both undue delay and prejudice to the defendant, and Isaac now appeals only the refusal to allow addition of the contract claim. That claim is, in essence, that Isaac's appointment as Associate Professor in 1971 carried with it an implied promise of tenure.

Leave to amend a pleading under Fed.R. Civ.P. 15(a) is a matter within the discretion of the trial court, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Serrano Medina v. United States*, 709 F.2d 104, 106 (1st Cir.1983); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 896 (1st Cir.1979), and an order denying leave to amend will be reversed only for an abuse of that discretion, *Serrano Medina*, 709 F.2d at 106; *Johnston v. Holiday Inns*, 595 F.2d at 896.

We find no such abuse in this case. Isaac offered no reason for the four-year delay in asserting his contract claim and, as the district court noted, it could not be that this claim was newly discovered "since the plaintiff is alleged to be a party to [the] conversations" on which the claim is based.

> "While courts may not deny an amendment solely because of delay and without consideration of the prejudice to the opposing party, ... it is clear that 'undue delay' can be a basis for denial[.] ... And where, as here, a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some 'valid reason for his neglect and delay'.... Appellant has failed to meet that burden." *Hayes v. New England Millwork*, 602 F.2d 15, 19–20 (1st Cir.1979) (citations omitted).

*See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Moreover, the court was entitled to believe that the new claim would result in undue prejudice to the defendant. If this claim had been allowed, Harvard would have been required to develop evidence of oral representations which occurred 13 years before Isaac's proposed amended complaint was filed. The district court found that the new claims "very materially change the nature of the complaint", and that "[t]he mere intervention of new counsel does not justify calling upon the defendant to respond to so stale a claim."

Under these circumstances, we can not say that the district court abused its discretion in refusing the amendment.

*The refusal of the proferred amendment is affirmed, but the summary judgment is reversed and the discovery order vacated and remanded for further proceedings consistent with this opinion.*